# EXHIBIT 1

# IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| **METROPOLITAN NASHVILLE** | ) | |
| **AIRPORT AUTHORITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. _____** |
| | ) | |
| **TURO, INC. and John Doe** | ) | **JURY DEMAND** |
| **Defendants 1-100,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff Metropolitan Nashville Airport Authority ("MNAA") states as follows

for its Complaint against Defendant Turo, Inc. ("Turo") and John Doe Defendants 1-100

(sometimes collectively, "Defendants"):

## NATURE OF CASE

1.     MNAA brings this action against Defendants for (1) violation of Section

2.60.050 of Title 2 of the Code of the Metropolitan Government of Nashville and

Davidson County, Tennessee; (2) trespass; (3) aiding and abetting trespass; (4) unjust

enrichment; (5) violation of the Tennessee Consumer Protection Act; and (6) declaratory

judgment based upon Defendants' unauthorized commercial activities at the Nashville

International Airport, which is commonly referred to by its International Air Transport

Association airport code, BNA ("BNA").

02552804 3

2.      Pursuant to its authority under state and local law, MNAA regulates all commercial activity at BNA, including all commercial ground transportation services. MNAA requires all commercial ground transportation operators to apply for and enter into a permit agreement, lease or other agreement with MNAA before being authorized to engage in any commercial operations at BNA. Among other things, the authorization process ensures safe and efficient use of the airport facilities, as well as the safety of the ground transportation services being provided to airport users. MNAA also requires all commercial ground transportation operators to pay fees so that MNAA can recoup the costs of developing and maintaining the airport infrastructure that makes such ground transportation businesses possible.

3.      Defendants have operated and are continuing to operate a commercial activity at BNA known as "peer-to-peer car sharing." However, Defendants have not applied for a permit, have not received any authority from MNAA to provide peer-to-peer car sharing services at BNA, and have not paid any of the requisite fees to operate at BNA. In addition to the revenues that MNAA has lost as a result of Defendants' unauthorized activities, Defendants' operations cause congestion on BNA's roadways and curbs, cause safety risks from that increased congestion, and result in an unfair competitive advantage for Defendants over other commercial ground transportation providers that have applied for and entered into a permit agreement or other agreement to operate at BNA and that pay fees to operate at BNA.

4.      MNAA seeks monetary damages, as well as preliminary and permanent injunctive relief to prohibit Defendants' unauthorized and illegal activities.

## PARTIES

5.      MNAA is a Tennessee corporation and a governmental body of the State of Tennessee. MNAA has its principal place of business at 140 BNA Park Drive, Suite 520, Nashville, Tennessee 37214.

6.      Defendant Turo is a Delaware corporation with its principal place of business at 111 Sutter Street, Suite 1300, San Francisco, California.

7.      John Doe Defendants 1-100 are individuals and/or companies that use Turo's online platform to rent vehicles to customers at BNA. Most, if not all, of the John Doe Defendants 1-100 are citizens and residents of Tennessee. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time MNAA may seek leave of this Court to add those individuals' and/or companies' actual names to the Complaint.

## JURISDICTION AND VENUE

8.      This Court has original subject matter jurisdiction over this action pursuant to Tenn. Code Ann. §§ 16-11-101, *et seq*.

9.      This Court has personal jurisdiction over each of the Defendants because they have transacted business in Nashville, Davidson County, Tennessee; engaged in the wrongful acts alleged herein in Nashville, Davidson County, Tennessee; and/or engaged in the wrongful acts alleged herein outside of Tennessee that have caused MNAA to suffer harm in Nashville, Davidson County, Tennessee.

10.      Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 20-4-101 and 102.

## FACTS

### A. Background

11. MNAA was created in 1970 under the Metropolitan Airport Authority Act, Tenn. Code Ann. §§ 42-4-101, *et seq.* ("the MAA Act") and Resolution 70-872 of the Metropolitan County Council of the Metropolitan Government of Nashville and Davidson County, Tennessee. Among other things, MNAA develops, finances, and operates BNA, which has been and continues to be one of the fastest growing airports in the country. In 2019, BNA serviced over 18 million domestic and international air passengers.

12. Pursuant to Section 2.60.030(A) of Title 2 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee, MNAA has control over BNA and the right to promulgate rules and regulations regarding all aspects of BNA's operations.

13. MNAA operates within a self-supporting budget without the financial assistance of local government. That being the case, BNA users must provide the funding necessary to develop, operate, maintain, and improve BNA's facilities.

14. The MAA Act provides that MNAA has "the right and duty to establish and charge fees, rentals, rates and other charges, and collect revenues therefrom . . . ." Tenn. Code Ann. § 42-4-107(10).

15. In addition, MNAA is required by federal law to maintain a fee and rental structure that makes BNA as financially self-sustaining as possible. *See* 49 U.S.C. §

47101(a)(13); Policy and Procedures Concerning the Use of Airport Revenue, 64 Fed. Reg. 7696, 7720 (Feb. 16, 1999).

16.     Under its statutory authority, and in fulfillment of its federal obligations, MNAA requires all business enterprises operating at BNA to obtain authorization to do so by written agreement, whether by permit, lease or other type of agreement, with MNAA. Under Section 2.60.050 of Title 2 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee, businesses are forbidden from using any portion of the airport facilities "for any commercial activities except under terms of a lease, contract or permit executed with the airport authority." The authorization process provides a mechanism for MNAA to ensure safe and orderly operations at its facilities and to collect fees from these businesses.

17.     In accordance with its authority and the procedures outlined above, MNAA requires all commercial ground transportation operators that provide services at BNA, whether they are based on or off BNA grounds, to apply for and enter into a permit agreement, lease, or other type of agreement with MNAA and pay certain fees.

18.     MNAA has adopted rules and regulations that were promulgated in the interest of safety and efficient operations of BNA ("Rules and Regulations"). A true and correct copy of the current version of MNAA's Rules and Regulations is attached hereto as Exhibit A.

19.     Section 1-1(A) of the Rules and Regulations provides: "No person shall utilize any portion of the Airport Property, or any structure thereon, for any commercial

activity except under the terms of a lease, contract, permit, or other instrument executed by the Airport Authority."

20.     Section 1-1(C) of the Rules and Regulations provides: "All persons engaged in Commercial Operations[1] on Airport Property will operate in such a way as to fully comply with these Rules and Regulations as well as any other relevant policy or procedure of the Airport Authority."

21.     Section 3-2(E) of the Rules and Regulations provides that the term "Commercial Ground Transportation Operators" includes "Peer to Peer Car Sharing." Section 3-2(E) further provides: "Any Commercial Ground Transportation Operator operating from the Airport must have a Ground Transportation Permit with the Airport Authority as outlined in the Commercial Ground Transportation Policy."

22.     MNAA has also adopted a Commercial Ground Transportation Policy which was promulgated to promote the safe and efficient use of BNA's limited facilities; develop safe, reliable, and convenient ground transportation options for airport users; and generate revenues needed for airport development, maintenance, and operations. A true and correct copy of the current version of MNAA's Commercial Ground Transportation Policy is attached hereto as Exhibit B.

23.     The Commercial Ground Transportation Policy imposes various requirements on all commercial ground transportation operators, including: (a) minimum quality of service standards for vehicles and personnel; (b) compliance with all airport

---

[1] MNAA's Rules and Regulations define the term "Commercial Operations" as "[a]ll operations of Aircraft for commercial purposes or any for profit operation or activity being conducted on the Airport." (Exhibit A, at 7).

and local traffic and parking laws and other rules; (c) minimum insurance requirements, with MNAA being listed as an additional insured on insurance policies; and (d) payment of applicable fees.

24. Section II of the Commercial Ground Transportation Policy expressly states that the Policy applies to "Peer to Peer Car Sharing." The Policy defines "Peer to Peer Car Sharing" as "[t]he authorized use of a vehicle by an individual other than the vehicle's owner through a platform that connects motor vehicle owners with drivers to enable the sharing of motor vehicles for financial consideration." (Exhibit B, at 12).

25. Section VI of the Commercial Ground Transportation Policy provides: "Prior to engaging in the transportation of passengers or property at the Airport, Commercial Ground Transportation Providers are required to submit a completed application described in APPENDIX 'H' of this Commercial Ground Transportation Policy, and, except for TNC and Peer-to-Peer Sharing Operators, submit a list of vehicles which will be providing Airport services . . . ."

26. After receiving a completed application showing that the commercial ground transportation operator can and will comply with all requirements, MNAA and the operator enter into an agreement. In the agreement, in addition to agreeing to comply with all aspects of the Rules and Regulations, the Commercial Ground Transportation Policy, and all other applicable laws and regulations, the operator must agree to, among other things: (a) provide MNAA with regular reports on its operations at the airport; (b) pay certain fees and charges; and (c) indemnify MNAA for liabilities arising out of its operations at the airport.

27.     Appendix F of the Commercial Ground Transportation Policy sets forth the fees that are imposed on all commercial ground transportation operators. For peer-to-peer car sharing, the Policy states as follows:

> Airport Based Peer-to-Peer Car Sharing Operators shall pay space rentals, **plus** the greater of a Minimum Annual Guarantee or Five Percent (5%) of the Operator's monthly Gross Revenue as contractually established with the Authority until July 1, 2021, at which time the 5% of Gross Revenues shall be increased to Six Percent (6%).

> Off-Airport Peer-to-Peer Car Sharing Operators shall pay the greater of a Minimum Annual Guarantee or Five Percent (5%) of the Operator's monthly Gross Revenues as contractually established with the Authority until July 1, 2021, at which time the 5% of Gross Revenues shall be increased to Six Percent (6%).

28.     In addition to the foregoing, MNAA's Commercial Ground Transportation Policy and authorization process ensure fair competition, on a level playing field, among the commercial ground transportation providers doing business at BNA.

29.     MNAA has entered into a permit agreement with the other peer-to-peer car sharing operator that provides car sharing services at BNA. This operator applied for the requisite permit, entered into the permit agreement with MNAA, and has paid and is continuing to pay the requisite fees.

30.     In addition, MNAA has entered into lease and concession agreements with ten traditional car rental brands that operate and provide car rental services at BNA. These traditional car rental companies applied to operate at BNA, have the requisite written authorization to operate at BNA, and have paid and are continuing to pay the requisite fees. Hundreds of other commercial ground transportation operators that

provide ground transportation services at BNA also have contracts with MNAA and pay the requisite fees.

### B.     Turo's Business Model

31.     Turo operates an online peer-to-peer car sharing platform on which individuals and businesses list cars for rent that users can pick up at various designated locations throughout the country, including at BNA, for short-term use.

32.     Turo may own some of the cars available for rent on its website, but, even if it does not, Turo is heavily involved in the rental process and provides a number of services to both car owners and car renters to facilitate their rental transactions.

33.     Turo posts rental car listings on its website and mobile applications and allows customers to search for specific cars or specific types of cars based on location and other filters.

34.     Turo provides 24/7 roadside service and emergency support to customers and screens prospective renters before allowing them to rent vehicles.

35.     Effective July 15, 2019, Turo requires that all of the individuals listing vehicles for rent on its website exclusively list those vehicles with Turo and prohibits users from listing their cars on any other car sharing platform.

36.     Turo provides professional photographers to take free photographs of the vehicles available for rent, and sets the rental price for each car "based on market value, location, time of year, and other data sets."

37.     Turo imposes a number of standardized policies on all rentals, including a cancellation policy, a cleaning policy, an additional usage (*i.e.*, late return) policy, a

security deposit policy, a smoking policy, a pet policy, a privacy policy, and standard terms of service.

38.     Turo collects payment from customers and, in exchange for Turo's services, retains a portion of that payment for itself and remits the remainder to the vehicle owner.

## C.     **Defendants' Operations at the Airport**

39.     Turo provides three options for renters to receive a rental vehicle: (1) the driver can pick up the car at the owner's location, (2) the owner can deliver the car to a designated location such as a particular airport or hotel, or (3) the owner can deliver the car to a custom location requested by the renter.

40.     In addition to encouraging car owners to make their cars available at airports, Turo touts the fact that many of the cars available for rent on its website can be picked up at airports, including BNA.

41.     A basic Google search for Turo's services at BNA returns results in which Turo advertises that users can "[s]kip the rental counter at Nashville International Airport (BNA)." The following are screenshots of those advertisements:



turo.com › Home › Car rental alternatives  ▾
Car rentals near Nashville International Airport (BNA) | Turo
Skip the car rental counter at Nashville International Airport (BNA). Book better cars shared by
local hosts, up to 35% less than car rental agencies.

turo.com › Home › SUV rental alternatives ▾

**SUV rentals near Nashville International Airport (BNA) | Turo**
Skip the SUV rental counter at Nashville International Airport (BNA). Book better SUVs shared by local hosts, up to 35% less than car rental agencies.

turo.com › Home › Sports car rental alternatives ▾

**Sports car rentals near Nashville International Airport (BNA ...**
Skip the car rental counter at Nashville International Airport (BNA). Book better sports cars shared by local hosts, up to 35% less than car rental agencies.

42.     On its website, Turo specifically advertises its "car rental alternatives" that are "near" BNA.

43.     Despite its use of the term "near," Turo's website identifies dozens of vehicles that can be rented at BNA. Indeed, Turo's website identifies vehicles that can be delivered to users at BNA for "free." The following is a screenshot of a listing of one such vehicle on Turo's website:

PICKUP AT CAR LOCATION

Brentwood, TN 37027                         FREE

DELIVERY LOCATIONS

Nashville International                      FREE
Airport

DELIVERED TO YOU

Up to 25 miles                              FREE

Free delivery to select locations for trips of 2 weeks
or longer

44.     The John Doe Defendants are owners of vehicles who use Turo's website and services to offer their vehicles for rent to customers at BNA. Upon information and belief, at least some of the John Doe Defendants own fleets of vehicles and are using Turo's website and services to participate in large-scale commercial operations at BNA.

### D.    MNAA's Attempts to Regulate Turo

45.    In February 2019, MNAA sent Turo a Notice of Non-Permitted Operations, advising that Turo was engaging in unauthorized commercial operations at BNA. MNAA advised that Turo must cease and desist from all further operations at BNA until Turo applies for a permit and enters into a permit agreement with MNAA.

46.    In February 2019, Turo responded by alleging that "Turo does not operate a ground transportation business, a rental car business, transportation network company or conduct any other commercial activity at Nashville International Airport." Turo made this assertion despite the fact that Turo's website identified (and continues to identify) multiple cars that could be rented at BNA.

47.    In March 2019, MNAA responded that Turo was effectively operating a rental car company at the airport. MNAA again reiterated that Turo must cease and desist from all further commercial activities at BNA until Turo applies for and enters a permit agreement.

48.    Despite MNAA's demands, Turo refused to apply for a permit and continued to provide peer-to-peer car sharing services at BNA.

49.    In the ensuing months, representatives of MNAA and Turo had multiple discussions regarding Turo's continuing operations at BNA, with MNAA engaging Turo and other peer-to-peer operators to collaboratively develop the peer-to-peer operating class in MNAA's Ground Transportation Policy, permit structure and fee schedule. Nonetheless, and despite MNAA's implementation of a peer-to-peer operating class and

permit, to this day Turo has refused to apply for a permit and has not paid any fees in connection with its peer-to-peer car sharing activities at BNA.

50. Defendants' continued operations at BNA without a permit agreement in place harms MNAA in multiple ways. For example, with no permit agreement in place, MNAA has no means to ensure that Defendants are providing safe and reliable vehicles to BNA patrons. Moreover, MNAA has only incomplete means of identifying and monitoring the scope of Defendants' operations at BNA or the effect those operations are having on the safe and efficient use of the airport facilities, including on congestion of airport roadways, curbs, and parking structures. MNAA also has no contractual enforcement mechanism to ensure Defendants are complying with all applicable laws, rules, and regulations. MNAA also does not have an indemnity agreement in place with Defendants, which exposes MNAA to potential legal expense related to Defendants' operations at BNA. Similarly, MNAA has no means to ensure that Defendants maintain insurance coverage that would protect MNAA for any losses or damages arising out of Defendants' operations at MNAA. MNAA also is being deprived of revenues that otherwise would be generated through Defendants' operations at BNA, which are needed for the development and maintenance of the airport infrastructure.

51. Defendants' continued operations at BNA without a permit agreement in place have also provided Defendants an unfair competitive advantage over other commercial ground transportation operators providing services at BNA, including the other peer-to-peer car sharing company and the numerous traditional car rental companies that operate at BNA, all of which have applied for the requisite permit or

agreement, entered into an agreement with MNAA, and have been paying all fees related to their operations at BNA.

## COUNT I – VIOLATION OF METROPOLITAN CODE
### (Against All Defendants)

52.     The foregoing paragraphs are hereby incorporated by reference.

53.     Section 2.60.050 of Title 2 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee prohibits Defendants from "utiliz[ing] any portion of the airport property or any structure thereon for any commercial activities except under terms of a lease, contract or permit executed with the airport authority."

54.     Defendants have not applied for the requisite permit and have not been granted any authorization to conduct peer-to-peer car sharing services or any other commercial activity at BNA.

55.     MNAA has suffered, and continues to suffer, harm as a result of Defendants' violation of Section 2.60.050 through, among other things, lost revenue, inability to control safe and efficient use of the airport property, inability to ensure that the vehicles rented by Defendants meet specified standards, and inability to ensure that Defendants have adequate insurance coverage for their business activities.

56.     Defendants' violation of Section 2.60.050 also harms the general public, as well as the properly authorized commercial ground transportation operators at BNA. Defendants' failure to pay any fees to MNAA for their use of the airport infrastructure, as well as Defendants' failure to abide by MNAA's Rules and Regulations, has given Defendants an unfair competitive advantage over other ground transportation providers

at BNA. Moreover, Defendants' disregard for MNAA's permitting requirements causes increased delay and congestion at the terminal curbs and BNA's roadways, and poses risks to passengers travelling at or through BNA.

57.     As a result of Defendants' unlawful conduct, MNAA has suffered monetary and non-monetary injuries for which MNAA is entitled to compensatory damages and injunctive relief.

58.     Further, Defendants are acting maliciously, intentionally, fraudulently, or recklessly, warranting an award of punitive damages.

## COUNT II – TRESPASS
### (Against All Defendants)

59.     The foregoing paragraphs are hereby incorporated by reference.

60.     MNAA owns and is in possession and control over all of BNA, including its roadways, terminal curbs, and other spaces at BNA used by Defendants.

61.     Defendants have not received authorization to conduct any commercial activity at BNA.

62.     MNAA has demanded that Turo cease and desist its conduct of advertising vehicles available to rent from BNA and of facilitating rentals by the John Doe Defendants at BNA.

63.     Despite these demands, Defendants have trespassed and are continuing to trespass on MNAA's property.

64.     As a result of Defendants' unlawful conduct, MNAA has suffered monetary and non-monetary injuries for which MNAA is entitled to compensatory damages and injunctive relief.

65.     Further, Defendants are acting maliciously, intentionally, fraudulently, or recklessly, warranting an award of punitive damages.

## COUNT III – AIDING AND ABETTING TRESPASS
### (Against Defendant Turo)

66.     The foregoing paragraphs are hereby incorporated by reference.

67.     The John Doe Defendants are committing the tort of trespass by conducting commercial activities at BNA without authorization from MNAA.

68.     Turo, at all material times, was and is aware of the prohibitions against unauthorized commercial ground transportation activity at BNA, including peer-to-peer car sharing, and was and is aware that the John Doe Defendants are committing the tort of trespass at BNA.

69.     Turo, by creating and operating its website, and by facilitating the rental of vehicles owned by the John Doe Defendants at BNA, is actively participating in, substantially assisting in, inducing, and/or otherwise encouraging the John Doe Defendants to engage in the tort of trespass.

70.     Turo has benefitted financially from the commission of trespass by the John Doe Defendants.

71.     As a result of Turo's actions in aiding and abetting trespass by the John Doe Defendants, MNAA has suffered monetary and non-monetary injuries for which MNAA is entitled to compensatory damages and injunctive relief.

72.     Further, Turo is acting maliciously, intentionally, fraudulently, or recklessly, warranting an award of punitive damages.

## COUNT IV – UNJUST ENRICHMMENT
### (Against All Defendants)

73.     The foregoing paragraphs are hereby incorporated by reference.

74.     MNAA has conferred and continues to confer a significant benefit upon Defendants by creating, developing, and maintaining BNA's infrastructure. This infrastructure not only makes Defendants' operations at BNA possible, it makes available to Defendants millions of potential customers every year.

75.     By conducting business operations at BNA and profiting from those operations, Defendants have appreciated and accepted the benefit that MNAA has conferred upon them, but have not paid any fees in connection with that benefit.

76.     Under the circumstances, it would be inequitable for Defendants to retain the benefits conferred upon them without payment, especially when they are depriving MNAA of the revenues needed to continue to develop and maintain BNA and when other commercial ground transportation operators have entered into agreements with MNAA and are abiding by MNAA's Rules and Regulations, including paying fees associated with their operations at BNA.

77.     Defendants should be required to compensate MNAA for the value of the benefit they have unjustly received.

## COUNT V – VIOLATION OF TCPA
### (Against All Defendants)

78.     The foregoing paragraphs are hereby incorporated by reference.

79.     By advertising the rental of cars at BNA and engaging in operations at BNA, Defendants are falsely representing to the consuming public that they are authorized and have the right to conduct commercial ground transportation services at BNA, which they do not have and which is actually prohibited by law.

80.     Defendants' conduct violates the Tennessee Consumer Protection Act, namely Tenn. Code Ann. §§ 47-18-104(b)(5) and 104(b)(12).

81.     As a result of Defendants' violations of the Tennessee Consumer Protection Act, MNAA has suffered monetary and non-monetary injuries for which MNAA is entitled to compensatory damages and injunctive relief, plus costs and fees.

82.     Defendants' conduct has been and continues to be willful or knowing. Accordingly, pursuant to Tenn. Code Ann. § 47-18-109(a)(3), MNAA is also entitled to treble damages.

## COUNT VI – DECLARATORY JUDGMENT
### (Against All Defendants)

83.     The foregoing paragraphs are hereby incorporated by reference.

84.     An actual controversy has arisen and exists between MNAA and Defendants concerning Defendants' commercial operations at BNA, their trespass at BNA, and Turo's aiding and abetting of trespass at BNA.

85.     MNAA is entitled to a declaration that Defendants are operating commercial ground transportation operations at BNA in violation of Section 2.60.050 of Title 2 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee, that these operations constitute a trespass at BNA, and that Turo has aided and abetted trespass at BNA.

## JURY DEMAND

MNAA hereby demands a jury to try the issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, MNAA requests that this Court:

(1)     Declare that Defendants, and each of them, are in violation of Section 2.60.050 of Title 2 of the Code of the Metropolitan Government of Nashville and Davidson County, Tennessee, and are trespassing at BNA, and that Turo is aiding and abetting the trespass of the John Doe Defendants at BNA;

(2)     Enter preliminary and permanent injunctions ordering Defendants, and each of them, to immediately cease and desist from any commercial operations at BNA without first obtaining due authorization from MNAA;

(3)     Award compensatory damages to MNAA and against Defendants in an amount to be proven at trial;

(4)     Award treble damages to MNAA and against Defendants in an amount to be proven at trial;

(5)     Award punitive damages to MNAA and against Defendants in an amount

        to be proven at trial;

(6)     Award attorney's fees and costs to MNAA and against Defendants; and

(7)     Grant such other relief as the Court deems just and proper, including pre-

        judgment interest.

                                Respectfully submitted,

                                */s/W. Scott Sims*
                                W. Scott Sims (#17563)
                                Michael R. O'Neill (#34982)
                                Grace A. Fox (#37367)
                                SIMS|FUNK, PLC
                                3322 West End Ave., Suite 200
                                Nashville, TN 37203
                                (615) 292-9335
                                (615) 649-8565 (fax)
                                ssims@simsfunk.com
                                moneill@simsfunk.com
                                gfox@simsfunk.com

                                *Counsel for Plaintiff*

# Exhibit A

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

# Rules and Regulations

*for the use of Airports and facilities for*

NASHVILLE INTERNATIONAL AIRPORT

and

JOHN C. TUNE AIRPORT

Policy #24-004
Effective:  September 1, 2020

Metropolitan Nashville Airport Authority
One Terminal Drive, Suite 501
Nashville, TN 37214



DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

**FOREWORD**

These rules and regulations as set forth herein are authorized by Tennessee Code Annotated Section 42-4-101 et seq. and Metropolitan Council Resolution Number 70-872. These rules have been adopted in the interest of safety and efficient operation of all Airports under the jurisdiction of the Airport Authority and are designed to protect the rights and safety of the Airport tenants and users.

**Approved by:**

| | |
|---|---|
| _[signature]_ | 8/19/2020 |
| Chief Operating Officer | Date |
| _Carrie Logan_ | 8/19/2020 |
| Legal Counsel | Date |
| _Douglas E Kreulen_ | 8/19/2020 |
| President & CEO | Date |

Case 3:21-cv-00128 Document 1-2 Filed 02/18/21 Page 24 of 102 PageID #: 35

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

# TABLE OF CONTENTS

Statistics of Airports ................................................................................................. 4

Definitions ................................................................................................................ 5

Scope ........................................................................................................................ 9

Adoption and Amendment ....................................................................................... 9

Liability .................................................................................................................... 9

*ARTICLE I – GENERAL* ........................................................................................... **10**

   1-1    Commercial Activity ..................................................................... 10

   1-2    Soliciting ....................................................................................... 11

   1-3    Advertising .................................................................................... 12

   1-4    Picketing ....................................................................................... 12

   1-5    Loitering/Criminal Trespass ......................................................... 12

   1-6    Disorderly Conduct ....................................................................... 12

   1-7    Public Intoxication ........................................................................ 12

   1-8    Sanitary Actions ........................................................................... 13

   1-9    Animals ......................................................................................... 13

   1-10   Use of Roads and Walks ............................................................... 13

   1-11   Photographs/Visual Recordings ................................................... 14

   1-12   Lost Articles .................................................................................. 14

   1-13   General Housekeeping .................................................................. 14

   1-14   Smoking ........................................................................................ 14

   1-15   Damage to or Destruction of Airport Property ............................ 15

   1-16   Storage of Property and Equipment ............................................ 15

   1-17   Abandonment of Property ............................................................ 16

   1-18   Alteration by Airport Tenants ...................................................... 16

   1-19   Schedule of Charges ..................................................................... 16

   1-20   Enforcement ................................................................................. 16

*ARTICLE II – AERONAUTICAL* ............................................................................. **17**

   2-1    Aircraft Regulations ..................................................................... 17

   2-2    Closing and Use of Airport ........................................................... 17

   2-3    Taxiing of Aircraft ........................................................................ 19

   2-4    Repair of Aircraft ......................................................................... 20

   2-5    Engine Run-Up ............................................................................. 20

   2-6    Disabled Aircraft .......................................................................... 20

   2-7    Parking of Aircraft ....................................................................... 21

   2-8    Helicopter Operations Rules ......................................................... 21

   2-9    Unmanned Aircraft Systems (UAS, but commonly referred to as drones) .... 21

   2-10   Aircraft Deicing ............................................................................ 22

   2-11   Regulated Garbage ....................................................................... 22

*ARTICLE III – VEHICLE OPERATIONS* .................................................................. **22**

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 25 of 102 PageID #: 36

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

3-1 Authorization and Access ........................................................................... 22
3-2 Vehicle Operation Guidelines ................................................................... 22
*ARTICLE IV – GENERAL SAFETY* .................................................................**27**
4-1 Observance and Adherence of Safety Procedures ............................... 27
4-2 Fueling Operations ..................................................................................... 27
4-3 Spillage ......................................................................................................... 28
4-4 Hunting and Firearms ............................................................................... 29
4-5 Grilling and/or Open Flames ................................................................... 30
4-6 Restricted Areas ......................................................................................... 30
4-7 Accident Reports ........................................................................................ 31
4-8 Emergency Conditions .............................................................................. 31
*References* ..........................................................................................................**33**
*Revision History* ...............................................................................................**33**

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

**Statistics of Airports**

### Nashville International Airport

| | |
|---|---|
| Location | 6 miles S.E. Nashville |
| Latitude | 36-07'-28.10" |
| Longitude | 86-40'-55.42" |
| Elevation | 599' MSL |
| Runways | 2L-20R - 7,704' x 150' |
| | 2R-20L - 8,001' x 150' |
| | 2C-20C - 8,001 x 150' |
| | 13-31   - 11,030' x 150' -    31 Threshold displaced 742' |
| | 13 Threshold displaced 802' |

### John C. Tune Airport

| | |
|---|---|
| Location | 9 miles N.W. Nashville |
| Latitude | 36-10'- 58.88" |
| Longitude | 86-53'-11.38" |
| Elevation | 4501' MSL |
| Runways | 2-20 – 6,001' x 100' |

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

The following rules and regulations will govern all conduct and activities, aeronautical or other, on the Airports owned by the Airport Authority. The Chief Operating Officer will propose and regularly update rules, regulations, and procedures relating to the operation, use and control of Airports and facilities related thereto, owned and/or operated by the Airport Authority. All rules and regulations will be approved by the Legal Counsel, Chief Operating Officer, and President & CEO. The Airport Authority will keep a permanent record of these Rules and Regulations for public inspection. The Chief Operating Officer will delegate responsibilities and authorities to administer these Rules and Regulations. Employees who are hosting visitors or have engaged contractors or tenants are responsible for communicating these Rules and Regulations.

**Definitions**

The following words, terms, or phrases where used herein shall have the meanings respectively ascribed as follows:

A. Aircraft

Any device used or intended to be used for flight in the air except a parachute or other invention used primarily as safety equipment.

B. Aircraft Movement Area

Runways, taxiways, and other areas of an Airport that are used for taxiing, takeoff, and landing of Aircraft, exclusive of loading ramps and parking areas.

C. Air Operations Area (AOA)

The AOA consists of all areas contained within the Airport perimeter fence at Nashville International Airport and John C. Tune Airport. These areas are subject to all the requirements set forth in the Airport Security Plan.

D. Airport

1. Any facility or area of land intended to be used for the landing, maneuvering, and take off of Aircraft, and

2. All contiguous property thereto held or used for aviation purposes, including all improvements and appurtenances thereon, regardless of the fact that these improvements and appurtenances may be owned, controlled, leased, or occupied by persons or governmental agencies other than the Airport Authority.

Case 3:21-cv-00128 Document 1-2 Filed 02/18/21 Page 28 of 102 PageID #: 39

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

3. Within these Rules and Regulations, unless otherwise specified, the term Airport shall refer to both Nashville International Airport and John C. Tune Airport.

E. Airport Authority

The Metropolitan Nashville Airport Authority created pursuant to the Metropolitan Airport Authority Act, Acts 1969, Ch. 174, codified in T.C.A. . § 42-4-101 et. Seq., and Resolution Number 70-782 of the Council of the Metropolitan Government of Nashville and Davidson County, Tennessee.

F. Airport Employee

Authorized personnel of all organizations, activities, and governmental agencies located on or connected with the operation, maintenance, and servicing of the Airports.

G. Airport Improvement Request (AIR) Manual

The Airport Improvement Request Manual defines uniform design and construction standards for physical improvements on airport property, and the required submissions prior to making changes to Airport Property.

H. Airport Property

Property presently owned or hereafter acquired by the Airport Authority.

I. ATC

Federal Aviation Administration Air Traffic Control Tower.

J. Board

The Board of Commissioners of the Airport Authority appointed by the Mayor and approved by the Council of the Metropolitan Government of Nashville and Davidson County, Tennessee.

K. Commercial Ground Transportation Policy

Policy establishing operating rules and regulations for all types of Commercial Ground Transportation Services at the Airport.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

L.  Commercial Operations

All operations of Aircraft for commercial purposes or any for profit operation or activity being conducted on the Airport.

M.  CEO

President and Chief Executive Officer of the Airport Authority.

N.  COO

Chief Operating Officer of the Airport Authority.

O.  FAA

The United States Department of Transportation Federal Aviation Administration.

P.  Fixed Base Operator

Any other person, organization, or sublessee engaged in business of an aviation nature conducting transient Aircraft services and being authorized to conduct such business by virtue of a contract with the Airport Authority in compliance with specified minimum standards.

Q.  Ground Transportation Permit

Permit required prior to engaging in the transportation of passengers or property at the Airport, in accordance with the Commercial Ground Transportation Policy.

R.  Motor Vehicle

Any self-propelled wheeled or tracked vehicle, including elements hitched thereto, for the conveyance of people or goods on Airport Property or for the service and maintenance of equipment or property.

S.  Person

Any individual, firm, corporation, partnership, company, association, joint stock association, or political body and includes any trustee, receiver, assignee, or other representative thereof.

T.  Public Area

Those areas including the terminal lobby, restrooms, and areas used for public thoroughfares, gathering, waiting, and viewing, streets and roads, sidewalks, and all others, except areas under lease to Airport tenants and

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

areas beyond the TSA Screening Checkpoints.  All other areas are to be considered Restricted Areas and access must be permitted by the Airport Authority.

U.     Restricted Areas

Areas which are closed to the general public. These areas are defined as areas which are used to perform the daily activities and operations of the Airports.  These areas include, but are not limited to, the AOA, tenant leased operational areas, perimeter roads, Airport Authority Administrative Offices, and locations having access to the AOA.

V.     Sterile Area

A portion of an Airport defined in the Airport security program that provides passenger's access to boarding Aircraft and to which the access generally is controlled by TSA, or by an Aircraft operator under part 49 CFR 1544 or a foreign air carrier under part 49 CFR 1546, through the screening of person and property.

W.     Tobacco Product

Any Tobacco Product, including smoking tobacco, smokeless tobacco, vaping, and other nicotine-delivery devices.

X.     TSA

The United States Department of Homeland Security's Transportation Security Administration.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Scope**

    A.    All users of, and persons on, the Airport shall be governed by these Rules and Regulations and the directions of the CEO and COO.

    B.    These regulations are not intended to amend, modify, or supersede federal, state, or local laws.

    C.    If any portion of these regulations shall be invalid or unenforceable, all other portions shall remain in effect and be construed to achieve the purposes hereof.

**Adoption and Amendment**

Rules and regulations and amendments thereto will be proposed as needed by the COO, and approved by the Legal Counsel, COO and CEO. Issued rules, regulations, and amendments thereto shall be noticed by posting a copy on the public notice bulletin board in the Airport Authority's Administrative Offices and by sending a copy to each Airport(s) tenant primarily affected. Upon such posting and notification, any person, within fifteen (15) days, may submit written comments and proposed changes to the COO. Thirty (30) days from issuing a proposed rulemaking, the COO will hold a hearing; at which time persons may appear whether in opposition to or in favor of the rulemaking. The date of such hearing shall be established in the notice of proposed rulemaking. Following that hearing, a revised rule or amendment will be issued if deemed appropriate, or notification that the original rulemaking has been incorporated in the official rules and regulations promulgated by the Airport Authority will be issued.

**Liability**

    A.    The Airport Authority, its officers and employees, by publication of said rules and regulations, assumes no responsibility for loss, injury or damage to persons or property by reason of fire, vandalism, wind, flood, earthquake, collision, strikes or Acts of God or of public enemy; nor does it assume liability for injury to persons while on Airport(s) or while using the facilities of same or for property damage.

    B.    All persons shall conduct activities and render services upon the Airport Property in a safe, responsible and efficient manner and shall be solely liable for having properly trained and instructed their agents and/or employees for such purposes.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

# Metropolitan Nashville Airport Authority

## Rules and Regulations

### *ARTICLE I – GENERAL*

**1-1    Commercial Activity**

A.    No person shall utilize any portion of the Airport Property, or any structure thereon, for any commercial activities except under terms of a lease, contract, permit, or other instrument executed with the Airport Authority.

B.    No person or corporation operating any facility on the Airport shall discriminate or permit discrimination against any person or group of persons in any manner prohibited by Title VI of the Civil Rights Act of 1964 or any other applicable federal, state, or local regulation or law.

C.    All persons engaged in Commercial Operations on Airport Property will operate in such a way as to fully comply with these Rules and Regulations as well as any other relevant policy or procedure of the Airport Authority.

D.    Owners, by the terms and conditions of a lease, contract, permit, or other instrument issued by the Airport Authority, operating facilities on the Airport, shall operate in such a way as to fully protect the Airport and its environs from any environmental pollution.   They shall operate in accordance with the United States Environmental Protection Agency (USEPA), Tennessee Department of Environment and Conservation, and the Metropolitan Government of Nashville and Davidson County's statutes, rules, and regulations.   The list of environmental concerns shall include, but not be limited to, the following:

1.    Asbestos

2.    Emissions to the atmosphere

3.    Hazardous material exposures – worker training

4.    Hazardous materials transporting

5.    Hazardous waste generation, storage, treatment and disposal

6.    Occupational health, safety, and environmental controls

7.    Release notification and emergency response

8.    Release/storage of oil and other petroleum products

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

9. Notification of releases to the environment

10. Storm water discharges

11. Wastewater discharges to a municipal sanitary sewer

12. Wastewater discharges to surface waters

13. Underground and above ground storage tanks

14. Use and release of Polychlorinated Biphenyls (PCB)

15. Waste disposal sites

16. Aircraft deicing

17. Confined space entry

E. Should the Airport Authority be required by any department of the Federal, State, or Metropolitan Government to take any action in order to be eligible for any Federal funds and this action relates to the property leased hereunder, then these persons and/or corporations will, at their own expense, take such action necessary to comply.

F. Owners, by the terms and conditions of lease, contract, permit, or other instrument with the Airport Authority operating facilities on the Airport, may be required to obtain United States Environmental Protection Agency (USEPA) storm water discharge permit for the National Pollution Discharge Elimination System (NPDES) or show financial responsibility for any contamination resulting from materials used or stored on their leasehold. These materials include, but are not limited to, fuel and other petroleum-based materials.

**1-2     Soliciting**

The soliciting of business, fares, alms, or funds for any purpose on Airport Property is prohibited without a permit approved by the Airport Authority in accordance with the Airport Authority's Speech-Related Activities Procedure, which is incorporated herein by reference in its entirety.  A copy of such procedure may be secured from the Airport Authority.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**1-3    Advertising**

No person or organization will pass, distribute, or display signs, and advertisements, circulars, printed or written matter on Airport Property or any structure thereon without an Airport Authority approved Speech Related Activities permit or in accordance with the provisions of a lease executed with the Airport Authority.  A copy of the Speech Related Activities Procedure may be secured from the Airport Authority.

**1-4    Picketing**

No person will walk in a picket line as a picket or take part in any labor or other public demonstration on any part of the Airport Property except in those places which may specifically be assigned for use of such picket lines or other public demonstrations by an Airport Authority approved Speech Related Activities permit.  A copy of the Speech Related Activities Procedure may be secured from the Airport Authority.

**1-5    Loitering/Criminal Trespass**

No person may loiter on any part of the Airport Property.  If a loitering person is told by an Airport police officer to leave Airport Property, that person shall do so or be subject to arrest for Criminal Trespass (T.C.A. § 39-14-405).

**1-6    Disorderly Conduct**

No person shall cause public annoyance or alarm, engage in fighting or threatening behavior, or refuse to obey an official order to disperse by police officer.  No person shall create hazardous or physically offensive conditions by any act that serves no legitimate purpose to include making unnecessary noise that prevents BNA/JWN passengers from carrying on normal activities (T.C.A § 39-17-305).

**1-7    Public Intoxication**

No person shall be on BNA/JWN property under the influence of a controlled substance, control substance analogue, or any other intoxicating substance to the degree that:  the offender may be endangered, there is an endangerment to other persons/property, or the offender unreasonably annoys people in the vicinity (T.C.A. § 39-17-310).

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**1-8    Sanitary Actions**

No person may dispose of garbage, papers, refuse, or other material on Airport Property except in the receptacles provided for that purpose; nor use comfort station other than in a clean and sanitary manner; nor expectorate on the floors, walls, or other surfaces of any Airport facility.

**1-9    Animals**

A.    No person may enter Airport with a domestic or wild animal without written permission of the Airport Authority, except:

1.    Persons entering any part of the Airport Property other than the terminal buildings, air freight, or other Restricted Areas with a domestic animal that is kept restrained by a leash or is confined so as to be completely under control.

2.    Persons entering the terminal, passenger boarding areas, cargo facilities, or Aircraft ramp with:
   a. animals confined to airline-approved pet carrier.
   
   Animals that are not recognized by the Americans with Disabilities Act as Service Animals but do meet the requirements under the Air Carrier Access Act to travel in the cabin of Aircraft as Service Animals must remain in airline-approved pet carriers until boarding the Aircraft or upon deplaning until exiting Airport buildings.
   
   b.    animals recognized by the Americans with Disabilities Act as Service Animals;
   
   c.    animals being trained by certified trainers to become Service Animals;
   
   d.    animals used by law enforcement for the detection of contraband, explosives, or apprehension of individuals;
   
   e.    animals that are trained therapy animals scheduled with, and approved by, MNAA for therapeutic visitation at the Airport.  Handlers will be required to provide insurance certificates meeting MNAA's requirements as well as up to date shot records.

**1-10    Use of Roads and Walks**

No person may travel on the Airport Property other than on roads, walks, or places provided for the particular class of traffic.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**1-11    Photographs/Visual Recordings**

No person may take still, sound, or motion pictures for commercial use on Airport Property without approval pursuant to the Speech Related Activities Procedure and the Photography of MNAA Property Procedure, from the Airport Authority.  A copy of the Speech Related Activities Procedure and Photography of MNAA Property Procedure may be secured from the Airport Authority.

**1-12    Lost Articles**

Finders of a lost article will turn the same into the Airport Information Center or, if the Airport Information Center is closed, to an Airport police officer on duty.  If the article is not claimed by its owner within thirty (30) days after it is deposited, it may be returned to the finder or otherwise disposed of in the discretion of the Airport Authority.

**1-13    General Housekeeping**

A.     All persons occupying space of the Airport Authority must keep the space allotted to them policed and free of rubbish and accumulation of any such material.  Only approved items shall be stored in Airport buildings or hangars.

B.     All floors must be kept clean and free from fuel and oil.  The use of volatile or flammable solvents for cleaning floors is prohibited.

C.     Approved trash receptacles shall be emptied on a timely basis as needs dictate; drip pans shall be placed under engines, kept clean and maintained in a safe manner.  An overall general appearance and cleanliness shall prevail throughout the Airport complex.

D.     All tenants with access to the AOA must ensure any debris that has the potential to create damage is immediately removed from the area. If unable to do so, notify the Airport Authority's Department of Public Safety.

E.     The Airport Authority's stormwater discharge permit does not allow the uncontrolled washing of equipment, vehicles, or Aircraft.  All washing activities must be performed in an area approved by the Airport Authority and by a method approved by the Airport Authority.

**1-14    Smoking**

A.   Use of any Tobacco Product is prohibited inside Airport Authority facilities at any time, except in designated identified concessions located on various concourses.

B.   Use of any Tobacco Product is prohibited in Airport Authority vehicles or personal vehicles when transporting people on Airport Authority business.

C.   Use of any Tobacco Product is prohibited outside the facilities, except in designated smoking areas located at least 25 ft. from entries, outdoor air intakes, or operable windows.   The location of designated outdoor smoking areas is identified by signage.

## 1-15   Damage to or Destruction of Airport Property

No person shall destroy, or cause to be destroyed, injure, damage, deface, or disturb in any way any building, sign, equipment, marker, or other structure, tree, flower, lawn, or property of any nature located on the Airport.

Any person causing or responsible for such injury, destruction, damage, or disturbance, including damage caused by the improper operation of a vehicle or Aircraft must immediately report such damage to the Department of Public Safety, and upon demand by the COO and/or designee, shall reimburse the Airport Authority for the full amount of the damage(s).  **This person may also be subject to the issuance of a Breach of Rules and/or additional fines.**

## 1-16   Storage of Property and Equipment

A.   Unless otherwise provided in a lease or other agreement, no person may use any area of the Airport for storage of property without the permission of the Airport Authority.

B.   No tenant or lessee on the Airport Property may store or stock material or equipment in such a manner as to constitute a hazard to personnel, passengers, or property.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**1-17    Abandonment of Property**

No person may abandon any personal property on the Airport Property nor leave such property temporarily unattended.  Any personal property so abandoned or unattended will be disposed of in the manner described by applicable laws or statutes. (T.C.A § 55-16-104 & T.C.A. § 66-29-120)

**1-18    Alteration by Airport Tenants**

A.     Prior to any sign addition, or other alteration, repair, and/or construction on leased property, the Airport tenant must submit an Airport Improvement Request (AIR) to the Airport Authority.  A copy of this procedure may be obtained from the Airport Authority Commercial Development Department.

B.     All phases of construction must meet federal, state, local, and Airport Authority requirements.

**1-19    Schedule of Charges**

Charges for the use of Airport Property and related facilities will be as determined and established by the Airport Authority.

**1-20    Enforcement**

The uniformed and/or plain clothed officers of the Airport Authority's Department of Public Safety and/or officers of creating municipalities are empowered to require compliance with these Rules and Regulations.  No authority is either hereby expressed or implied, however, that would permit any individual other than the CEO to change, alter, or amend these rules and regulations.  MNAA Leadership is authorized to interpret and construe these regulations wherever necessary, either by directives of general or specific application, and those interpretations and construction may be deemed a part of the regulations and binding upon all persons.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

# Metropolitan Nashville Airport Authority

## Rules and Regulations

*ARTICLE II – AERONAUTICAL*

**2-1    Aircraft Regulations**

All aeronautical activities at the Airport and all flying of Aircraft, manned or unmanned, within the Airport traffic area shall be governed by the FAA.

**2-2    Closing and Use of Airport**

A.    The Airport Authority will have the right at any time to close the Airport in its entirety or any portion thereof to air traffic, to delay or restrict any flight or any portion thereof to any specified class of Aircraft or to any individual or group when such actions are necessary and desirable to avoid endangering persons or property and to be consistent with the safe and proper operation of the Airport.  In the event the Airport Authority believes the condition of the Airport to be unsafe for landings and takeoffs or in violation of the rules, regulations, and federal standards, it will be within the authority of the COO, or delegates, to issue or cause to be issued, a NOTAM (Notice to Airmen) closing the Airport or any portion thereof.

B.    No Aircraft may be operated on the surface of any Airport runway, taxiway, ramp, or Aircraft parking and storage area  in a careless or negligent manner or in disrespect of the rights and safety of others; or without due caution and at a speed likely to unreasonably endanger persons or property; or while the pilot or other persons aboard controlling any part of the operation thereof is under the influence of intoxicating liquor as defined as the minimum allowable blood alcohol content to be considered "intoxicated" by state and/or local laws or any narcotic or habit-forming drug; or if such Aircraft is so constructed, equipped, or loaded as to endanger or to be likely to unreasonably endanger persons or property.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

C. Prior approval from the Airport Authority is required before landing and takeoff is permitted on the Airport by an Aircraft in excess of the following:

Nashville International Airport:

**Rwy 2R/20L**
PCN 59 /R/B/W/T

**Rwy 2C/20C**
PCN 56 /R/B/W/T

**Rwy 2L/20R**
PCN 70 /R/C/W/T

**Rwy 13/31**
PCN 70 /R/C/W/T

John C. Tune Airport:

**Rwy 2/20**
PCN 41 F/A/W/T

Consult the Airport 5010 for current Airport pavement conditions.

D. No Aircraft exceeding a gross weight of 12,500 pounds may be permitted to make a 180 degree turn on any asphalt runway or taxiway unless required to do so due to an operational necessity. The owner of an Aircraft causing damage to the asphalt surface while executing an unauthorized 180 degree turn on a runway or taxiway will be responsible for the cost of repair to the surface.

E. No Aircraft may fly over the BNA Main Terminal Building.

F. Aircraft authorized to conduct practice approaches at BNA are as follows:

1. Aircraft with a gross weight of less than 12,500 pounds

2. Aircraft which are propeller powered with turbine or piston power plants

3. Single or twin-engine Aircraft

4. Civilian Aircraft only

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

Practice approaches are not permitted between 2300L and 0700L.

There are no restrictions related to practice approaches at JWN.

G.      No turbojet Aircraft training flights may be permitted without prior notification of and approval from the Airport Authority.

H.      Turbojet Aircraft will be permitted to make overhead approaches only on Runway 13/31.  Turbojet Aircraft overhead approaches to Runway 2R/20L will be permitted only when traffic and/or weather dictates.  The traffic pattern altitude will be 2,100 feet.

## 2-3      Taxiing of Aircraft

A.      No person may taxi or tow an Aircraft upon the Aircraft Movement Area of the Airport until appropriate communications have occurred.  Also, no person may taxi or tow an Aircraft upon the ramp, approved parking space, or hangar area until they have ascertained that there will be no damage or collision with other Aircraft, persons, or objects.

B.      No person may taxi an Aircraft with inadequate brakes or other malfunctioning systems that could impede the control of the Aircraft near buildings, parked Aircraft, or equipment.

C.      Aircraft awaiting takeoff must stop short of the surface painted holding position markings and in a position to have a direct view of Aircraft approaching for landings.  Aircraft are to hold at painted lines at "critical area" signs during IFR conditions and approach hold signs as instructed by ATC.

D.      Aircraft entering all ramps are to use taxiways leadoffs.  Aircraft departing all ramps are to use appropriate communication once under power and prior to the non-movement area boundary markings for assignment to a specific exit point.

E.      Aircraft taxiing via ramp between leased areas is prohibited.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**2-4    Repair of Aircraft**

A.    No person may repair any Aircraft or component of an Aircraft, in any facility on Airport Property other than a facility specifically designed and built for such purpose. Minor adjustments and repairs may be performed on air carrier Aircraft at gate positions or approved ramp locations on the terminal ramp when such repairs can be accomplished without inconvenience to other persons and when such adjustment is necessary to prevent a delayed departure. The designated area for maintenance by non-air carrier Aircraft may be marked and signed by the respective tenant who shall be responsible for advising all subleases and other users of this location. Persons conducting maintenance in T-Hangar facilities must have prior approval in writing from the Airport Authority. All persons should exercise good housekeeping practices.

B.    All persons engaged in the maintenance, repair, and servicing of Aircraft will do so in accordance with the rules and regulations of applicable agencies, to include, but not limited to the following: FAA, U.S. Environmental Protection Agency, National Board of Fire Underwriters, U.S. Department of Labor Occupational Safety and Health Act, Airport Authority, and other governmental agencies with jurisdiction.

**2-5    Engine Run-Up**

A.    No person may start or run any engine on an Aircraft unless a competent person is in the Aircraft attending the engine controls. Chocks must always be placed in front of the Aircraft wheels before starting the engine unless the Aircraft is provided with adequate parking brakes.

B.    Aircraft may not perform engine run-up or prolonged test operations in any area other than approved engine run-up locations. At no time may engines be run-up for test or maintenance purposes between the hours of 2300L and 0600L without prior approval by the Airport Authority and at a designated location on the Airport.

C.    No person may start an engine of an Aircraft while it is in a hangar or enclosed space.

**2-6    Disabled Aircraft**

A.    The owner, or representative (i.e., pilot or operator), will be responsible for the prompt removal of Aircraft wrecked or damaged on the Airport as reasonably directed by the Airport Authority after such Aircraft has been

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

officially released by National Transportation Safety Board or Federal Aviation Administration Flight Standards District Office representatives if applicable. In case an Aircraft becomes disabled while on the Aircraft Movement Area due to a flat tire, engine failure, etc., the owner or representative shall arrange for the immediate removal of the Aircraft and oversee the process. In case the owner or representative fails to immediately remove the wrecked, damaged, or disabled Aircraft, such may be removed by order of the Airport Authority at the owner's or representative's expense without liability for damage which may result in the course of or after such removal.

B.      The owner of unsightly or unairworthy Aircraft parked or stored on Airport Property will be responsible for the removal of same within thirty (30) days, or sooner if in the opinion of the Airport Authority such Aircraft creates an image detrimental to the appearance of the Airport and aviation.

## 2-7     Parking of Aircraft

A.      No person may park Aircraft in any area on Airport Property other than designated areas.

B.      Aircraft parked on areas of leased Airport Property must be under the lessee's control and liability.

## 2-8     Helicopter Operations Rules

A.      No persons may park a helicopter in any area on the Airport Property other than designated areas.

B.      Helicopter arrivals and departures into the Airport will use the Aircraft Movement Area or other areas designated by the Airport Authority. ATC will direct helicopters into these areas.

C.      Helicopter operations must avoid taxiing over or parking in close proximity to a fixed wing Aircraft.

D.      Helicopter arrivals and departures into the Airport will not fly over any Airport buildings, structures, or automobile parking area.

## 2-9     Unmanned Aircraft Systems (UAS, but commonly referred to as drones)

The control of unmanned Aircraft systems from Airport Property is prohibited without prior written approval of the COO. The use of drones is subject to the

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

provisions of Federal Aviation Regulations Part 101 and 107 and Public Law 112, Section 336. Drones operating contrary to this policy or federal regulations will be reported to law enforcement. See MNAA Unmanned Aircraft System (UAS) Policy (21-001).

**2-10    Aircraft Deicing**

Deicing of Aircraft may only be performed at BNA in those areas designated for Aircraft deicing in the Airport Authority's Snow and Ice Control Plan.

**2-11    Regulated Garbage**

All Animal and Plant Health Inspection Service (APHIS) regulated garbage must be handled and disposed of in accordance with the United States Department of Agriculture, APHIS policies, which are written in support of the Code of Federal Regulations (CFR), Title 7 CFR 330.400 through 330.403 and Title 9 CFR 94.5.

***ARTICLE III – VEHICLE OPERATIONS***

**3-1    Authorization and Access**

A.    Motor Vehicle operation on Airport Property will be governed by the provisions of the Metropolitan Traffic and Parking Commission, Tennessee Code Annotated, as amended, Code of Laws of the Metropolitan Government, relevant private acts, and such regulations as promulgated from time to time by the Airport Authority, including but not limited to the Commercial Ground Transportation Policy.

B.    The operator of each ground vehicle must meet the qualifications of the specific Airport for access to the AOA or any ramp area.

C.    Motor Vehicles with axle load exceeding 42,500 pounds are not permitted upon Aircraft parking areas, service roads, or perimeter roads without approval of the Airport Authority.

D.    Two-wheel vehicles (i.e. bicycles, motorcycles, etc.) will not be allowed to operate inside the AOA fence line unless approved by the Airport Authority.

**3-2    Vehicle Operation Guidelines**

A.    Vehicle Operations

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

1.　No motorized equipment may be operated on the Aircraft parking ramps, the Aircraft Movement Area, or Airport perimeter roads except:

    a.　By persons assigned duty thereon,

    b.　By persons authorized by the Airport Authority, and

    c.　By persons escorted by an approved escort vehicle of the Airport Authority, or in a vehicle approved by the Airport Authority.

2.　No vehicle will be allowed to enter upon the Aircraft Movement Area (taxiways and runways) either day or night unless equipped with a radio with two-way communications with ATC or escorted by a vehicle so equipped.　No vehicle may enter the Aircraft Movement Area until clearance has been given by ATC.　It is the responsibility of all vehicle operators to be conversant with the standard Airport light signals regardless of whether vehicle is radio equipped.　(In the absence of a control tower, the assigned Airport supervisor may grant right to enter Aircraft Movement Areas.)

3.　Operators of motorized equipment must operate such equipment with extreme caution.　The following speed limits will be strictly enforced, unless otherwise indicated on signs posted and maintained by the Airport Authority:

    a.　Aircraft Parking Areas – 15 mph

    b.　Baggage Claim Drive – 10 mph

    c.　Terminal Service Drive – 10 mph

    d.　Perimeter Roads – 30 mph

    e.　Terminal Passenger Loading Ramps – 15 mph

    The maximum baggage or freight cart train shall consist of one (1) tug and four (4) tandem carts.

4.　No person may operate any motorized vehicle upon any area of the Airport if such vehicle with or without towed equipment is so constructed, equipped, or loaded so as to be a danger or is likely to

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

endanger persons or property. All persons riding in any motorized vehicle must be seated in seats permanently affixed to the vehicle.

5. All motorized vehicles while operating upon an Aircraft ramp area must pass to the rear of taxiing Aircraft and may not be driven between a parked Aircraft and its loading gate while enplaning or deplaning activities are in effect. Driving under passenger boarding bridges is strictly prohibited.

6. Vehicles will yield right-of-way to all Aircraft.

7. All vehicles utilizing gates which access the AOA, including perimeter and service roads, must wait for the gate to close before proceeding. Entry by unauthorized vehicles into these areas will be promptly reported to the Department of Public Safety.

8. All vehicles will drive in the marked roadways on the ramp areas and will not drive across an open ramp area.

B.  Airport Roadways

Motor Vehicles may be operated by a licensed driver in strict compliance with posted stop, yield, pedestrian, parking, road direction, road height clearance, and speed limit traffic signs.

C.  Repair of Motor Vehicles

No person may clean or make any repairs to Motor Vehicles anywhere on the Airport Property other than in designated shop areas except minor repairs necessary to remove such Motor Vehicles from the Airport Property, nor shall any person move, interfere with, or tamper with any Motor Vehicle part, instrument or tool thereof without permission of the owner or satisfactory evidence of the right to do so duly presented to the Airport Authority.

All work performed on vehicles must be to vehicles that have an operational need to be on Airport Property.

D.  Vehicle Parking

1. No person will park a Motor Vehicle for loading or unloading, or any other purpose on the Airport Property, other than in the manner prescribed by signs, lines, or other means.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

2. No person will park a Motor Vehicle in an area requiring payment for parking thereon without paying the required parking fee; nor outside a designated parking space; nor in a manner so as to obstruct roadways; nor in Aircraft parking areas; nor in grass areas or other areas not designated for parking.

3. If authorized by the Airport Authority, employees of organizations or agencies having tenancy on Airport Property may park private vehicles in the employee parking lots as designated by the Airport Authority. Follow procedures for the designated lots as required. (An exception will be the Temporary Permit issued by the Airport Authority Identification Office). Registration of the vehicles will be made with the Airport Authority, and the fees for parking agreements established by the Airport Authority will prevail. Registration of vehicle will be renewed on a routine basis.

4. No person may abandon any Motor Vehicle on Airport Property.

5. The Airport Authority will have the authority to tow or otherwise move vehicles which are parked by their owners or operators on the Airport Property in violation of the regulations of the Airport Authority, state or local laws, or regulations at the operator's expense and without liability for damage which may result in the course of such moving.

E. Commercial Ground Transportation

Commercial Ground Transportation Operators include but are not limited to Charter Buses, Courier/Package Delivery Services, Courtesy Vehicles, Fixed Base Operators (FBO) Shuttles, Hotel/Motel/Corporate Shuttles, Limousines, Occasional Users, Public Transit Systems, Rental car Shuttles, Shuttle Service Operators, Sightseeing Services, Special Event Transporters, Taxicabs, Transportation Network Companies, Peer to Peer Car Sharing, and Valet Parking Shuttles.

Any Commercial Ground Transportation Operator operating from the Airport must have a Ground Transportation Permit with the Airport Authority as outlined in the Commercial Ground Transportation Policy. Such operations are limited to the terms and conditions set forth in the Commercial Ground Transportation Policy, which is incorporated herein by reference in its entirety.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**Metropolitan Nashville Airport Authority**

**Rules and Regulations**

F.      Procedure in Case of Accident

The driver of any vehicle involved in an accident on the Airport which results in injury to any person or damage to any vehicle, Aircraft, or property must immediately stop such vehicle at the scene of the accident and report such accident to the Department of Public Safety or to the Metropolitan Police Department in which the Airport is located.  The operator of such vehicle, within a reasonable time after the occurrence, will make other reports as may be required by and in accordance with federal, state, and local laws and regulations.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

***ARTICLE IV –GENERAL SAFETY***

**4-1     Observance and Adherence of Safety Procedures**

A.  All persons in any way using the Airport Property and/or its facilities shall exercise the utmost care to guard against fire and/or injury to persons or property.

1.  No person shall walk across an open ramp area.  Walking will be permitted between terminal building and the designated roadway.

2.  There will be no "play" on any ramp areas by employees

**4-2     Fueling Operations**

A.  Each person except air carriers operating under FAR Part 121 or FAA Part 135 engaged in fueling or defueling on Airport Property shall do so in accordance with FAR Part 139 Airport Authority rules and regulations and have necessary permits/licenses as may be required.  Each person will be subject to a fire safety inspection of the fuel farm/storage area and mobile fuelers.

B.  No person may fuel or defuel an Aircraft on Airport Property while:

1.  Its engine is running, or the engine is being warmed by applying external heat.

2.  It is in a hangar or enclosed space.

3.  Passengers are in the Aircraft, unless a passenger loading ramp is in place at the cabin door; the door is open; and a cabin attendant is at or near the door.  Medivac Aircraft are allowed to fuel with passengers on the Aircraft with prior approval from the Airport Authority.

C.  No person may start the engine of an Aircraft on Airport Property if there is any gasoline or other volatile flammable liquids on the ground underneath it.

D.  No person may operate a high frequency radio transmitter or receiver or switch electrical appliances on or off in an Aircraft on Airport Property while it is being fueled or defueled.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

E.     During the fueling of an Aircraft on Airport Property, the dispensing apparatus and the Aircraft must be bonded in accordance with current safety standards.  During active fueling operations, cell phone use is strictly prohibited.

F.     Each person engaged in fueling or defueling on Airport Property must exercise care to prevent the overflow of fuel and must have readily accessible adequate fire extinguishers and absorbent materials.

G.     During the fueling and defueling of an Aircraft on Airport Property, no persons may smoke or use any materials that are likely to cause a spark or be a source of ignition.  Smoking is prohibited on all Aircraft parking areas.

H.     Each hose, funnel, or accessory used in fueling or defueling an Aircraft on Airport Property must be maintained in a safe, sound, and non-leaking condition and must be properly grounded to prevent ignition of volatile liquids.

I.     Fire extinguishing equipment must be readily available during fueling and defueling operations.

J.     Fueling vehicles should be parked parallel to or heading away from the Aircraft wing leading edge, so it may be moved away quickly in the event of an emergency.  In positioning for refueling, the operator of the vehicle must make a complete stop at 20 feet and then be directed by another person to not less than 10 feet from the Aircraft.  Corporate policies more stringent than the above and/or an approved FAA fueling procedure may be applied.

K.     Failure to comply with National Fire Protection Association (NFPA) standards, the Airport Certification Manual and/or any applicable FAA Advisory Circulars can result in the issuance of a Notice of Violation, Breach of Rules, or a monetary fine; or any combination thereof.  Contact an Airport Authority Aviation Fuel Safety Inspector to address any questions or concerns related to this matter.

L.     ABC multipurpose dry chemical fire extinguishers (ammonium phosphate) shall not be placed on Aircraft fueling vehicles, Airport fuel servicing ramps or aprons, or at Airport fuel facilities that are located within (500 ft) of Aircraft operating areas (Reference current edition of NFPA 407).

**4-3     Spillage**

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

A.     In the event of spillage or dripping of petroleum products, or any material on Airport Property which may cause a hazardous condition detrimental to the ground or pavement surface, cause harm to the environment, or create an unsightly condition; the same must be removed immediately. The removal will be in accordance with United States Environmental Agency standards, the Airport Authority Spill Prevention Control and Countermeasure Plan and Emergency Response Procedure. The responsibility for removal of such spillage or drippings will be assumed by the operator of the equipment causing the same or by the tenant responsible for the deposit thereof.

B.     No fuel, grease, oil, flammable liquids, or contaminants of any kind will be allowed to flow or be placed in any sewer or drainage system on the Airport.

C.     Owners and operators of fueling facilities may be required to prepare and maintain an approved Spill Prevention Control and Countermeasure Plan (SPCC Plan). The Federal Clean Water Act of 1977, amendments of 1987, the Oil Pollution Act of 1990, and 40 Code of Federal Regulations, Part 112, Oil Pollution Prevention, require preparation of a plan for certain storage capacity facilities. The Airport Authority may request copies of the plan and updates to the plan. Owners and operators of these regulated facilities must operate as specified in Paragraph 4A-1-5-C.

D.     Any fuel spill occurring outside of secondary containment, no matter the size, must be reported immediately to the Airport Communications Center (615-275-1703).

E.     Spill pans of sufficient coverage must be placed under all connection points when topping fuel trucks or transferring fuel from truck to truck.

F.     The dumping or disposal of sump fuel into the fuel hydrant pits is strictly prohibited.

G.     Any fuel spill of less than 5 gallons occurring inside a secondary containment must be cleaned up immediately but need not be reported to the Airport Communication Center.

**4-4     Hunting and Firearms**

Hunting or the discharge of firearms on the Airport Property is prohibited unless permission has been obtained from the Airport Authority.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

**4-5     Grilling and/or Open Flames**

There will be no grilling or open flames within the AOA without prior written approval from the Airport Authority.

Hot work permits must be obtained through the Airport Authority's Maintenance Department for all work requiring an open flame.

**4-6     Restricted Areas**

A.     No person may enter any Airport Property area or building posted with signage or secured by card reader with the exception of the following:

1.     Persons assigned to duty therein under the authorization of an Airport tenant and/or the Airport Authority.

2.     Persons authorized under contractual agreements with the Airport Authority.

3.     Authorized representatives of the Federal Aviation Administration or the Transportation Security Administration.

4.     Persons engaged, or about to be engaged, or having been engaged, in the operation of any Aircraft.

5.     Passenger under appropriate supervision (escort) entering ramp operational areas for the purpose of enplaning or deplaning Aircraft.

6.     Police or fire personnel with equipment in case of an emergency.

B.     Restricted Areas at the Nashville International Airport are designated in the approved Airport Security Program (ASP) as required by the Transportation Security Administration's regulations, Part 49 CFR 1542. These areas cover the following:

1.     All persons authorized access to the AOA must have an identification badge or be under escort of a properly badged Airport Employee.

2.     The operator of each ground vehicle authorized access to the AOA must display upon both sides of the vehicle visual identification (i.e., decal, sign, logo) along with approved Airport-issued vehicle

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

identification media while operating in that area. Any exception to this rule will be as directed by appropriate TSA regulations.

3. All persons upon entering the Sterile Area are subjected to be screened, along with x-ray of their baggage and investigation of their personal items. Any exception to this rule will be as directed by appropriate TSA regulations.

4. All doors in the terminal sterile concourses that enter to a ramp operational area must be kept locked and/or controlled at all times.

5. All tenant organizations on the Airport in which their leased areas access the AOA will be responsible for security in their respective area to ensure that doors, gates, service docks, etc. are locked or properly controlled so as to prevent unauthorized entry. In addition, all persons utilizing doors or gates to any Restricted Area (i.e., perimeter road gates) are required to observe the door or gate close so as to prevent unauthorized persons and/or vehicles from gaining access.

6. Each person entering the Restricted Areas in violation of security requirement is subject to be assessed a civil penalty (fine) by the TSA and/or the Airport Authority. This penalty will be assessed against the person committing the violation and/or respective Airport tenant.

## 4-7    Accident Reports

All persons involved in any accident, including Aircraft or automobile, occurring on the Airport Property shall make a full report to the Airport police officer on duty as soon after the accident as possible. When a written report of an Aircraft accident is required by Federal Aviation Regulations, a copy of such report may be submitted in lieu of the report required above. (T.C.A. § 55-12-104)

## 4-8    Emergency Conditions

A. Emergency conditions existing on the Airport Property will not mitigate or cancel any responsibilities under these Rules and Regulations unless authorized by the Airport Authority with respect to protection of life.

B. All persons and vehicles must yield right-of-way to emergency equipment.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

C.    All persons will move as directed to designated areas/exits as conditions dictate in appropriate emergency plans.

DocuSign Envelope ID: FDA1B7B3-3619-4BC7-8B33-3FE6F11C95F0

*References*

Tennessee Code Annotated
T.C.A. § 42-4-101 et seq., Metropolitan Airport Authority Act
T.C.A. § 39-14-405, Criminal Trespass
T.C.A § 39-17-305, Disorderly Conduct
T.C.A § 39-17-310, Public Intoxication
T.C.A § 55-16-104, Authority to Take Possession of Abandoned Motor Vehicles of those
   used in Curbstoning
T.C.A. § 66-29-120, Custody of Property Presumed Abandoned if Transaction Took Place
   in this State
T.C.A. § 55-12-104, Report of Accident Required – Suspension of Registration or
   Operating Privileges for Failure to Report – Restoration – Access to Information


Metropolitan Government of Nashville & Davidson County
Metropolitan Council Resolution Number 70-872

Federal
Americans with Disabilities Act
Code of Federal Regulations, Part 112, Oil Pollution Prevention
Federal Aviation Regulations, Part 139
Federal Clean Water Act of 1977, amendments of 1987
Oil Pollution Act of 1990
Title VI, Civil Rights Act of 1964
U.S. Department of Labor Occupational Safety and Health Act

Metropolitan Nashville Airport Authority
Airport Certification Manual
Airport Improvement Request (AIR) Manual
Airport Security Plan
Commercial Ground Transportation Policy, 24-002
MNAA Unmanned Aircraft System (UAS) Policy, 21-001
Photography of MNAA Property Procedure, 31-007
Speech-Related Activities Procedure, 51-004
Commercial Ground Transportation Policy, 24-002

*Revision History*

| | |
|---|---|
| Sep. 1 2020 | Defined approval authority; Delegated responsibilities and authorities to COO; Defined responsibilities for communication; Updated definitions; Updated all sections to reflect current rules and regulations; Added public intoxication, smoking, UAS, aircraft deicing and regulated garbage; Added references; Added revision history |
| April 1999 | Prior issue |

# Exhibit B

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# Commercial Ground Transportation Policy

_____

**Policy #61-003**

**Effective:  <u>October 1, 2020</u>**

Nashville International Airport

One Terminal Drive, Suite 501

Nashville, TN 37214



# Commercial Ground Transportation Policy

## Policy #61-003

## Effective: October 1, 2020

**Approved by:**

| | |
|---|---|
| *Carrie Logan* (DocuSigned by) — 3679D97A859242B... | 9/24/2020 |
| Legal Counsel | Date |
| (DocuSigned by) — 4AE74A68A707428... | 9/29/2020 |
| Chief Operating Officer | Date |
| (DocuSigned by) — 1157AA7A82414C2... | 9/29/2020 |
| Chief Development Officer | Date |
| *Douglas E. Kreulen* (DocuSigned by) — 9971F03A387B487... | 9/29/2020 |
| President & CEO | Date |

# INDEX

**Section**                                                                      **Page**

SECTION I        INTRODUCTION AND OBJECTIVES  ....................................................... 1

SECTION II       RULES AND REGULATIONS ................................................................... 3

SECTION III      CLASSIFICATION OF OPERATORS ........................................................ 4

SECTION IV       FEES AND CHARGES ............................................................................. 4

SECTION V        INSURANCE REQUIREMENTS ............................................................... 6

SECTION VI       APPLICATION ........................................................................................ 6

SECTION VII      REFERENCES AND REVISION HISTORY .............................................. 7

APPENDIX "A"    DEFINITIONS ........................................................................................ 8

APPENDIX "B"    RULES OF CONDUCT ........................................................................... 16

APPENDIX "C"    FINES, SUSPENSION AND REVOCATION
                 OF OPERATING PRIVILEGES ................................................................ 22

APPENDIX "D"    OPERATOR CLASSIFICATIONS  ........................................................... 25

APPENDIX "E"    MINIMUM INSURANCE REQUIREMENTS ............................................. 28

APPENDIX "F"    SCHEDULE OF FEES AND CHARGES ................................................... 29

APPENDIX "G"    CLASSIFICATION OF VEHICLES .......................................................... 33

APPENDIX "H"    APPLICATION INSTRUCTIONS  ............................................................ 34

APPENDIX "I"    GROUND TRANSPORTATION MAPS ..................................................... 35

# SECTION I

## <u>INTRODUCTION AND OBJECTIVES</u>

Enactment of reasonable standards, regulations, procedures and fees for conducting commercial ground transportation operations at the Nashville International Airport helps promote the safe and efficient use of limited airport facilities, including alleviation of congestion on airport roadways and terminal curbsides; the preservation and generation of revenues needed for airport development, maintenance, and operations; and the development of reliable and convenient ground transportation options for the traveling and shipping public.

Under federal airport grant assurances, the Authority is obligated to establish a fee and rental structure designed to make the Airport as self-sustaining as possible under the circumstances at the airport [49 U.S.C. 47107(a)(13)]. Because the Authority receives no general tax dollars from the community, the Authority must seek to raise revenues from contracts, licenses, permits, and leases issued by the Authority to both aeronautical and non-aeronautical users of the Airport.

Imposition of fees for operations at the Airport by Commercial Ground Transportation Operators helps raise revenues in two ways. First, such fees directly provide additional revenues to the Airport. Second, airport access fees can help preserve existing revenues at the Airport, such as those obtained from on-airport car rental concessions, by making it less likely that such concessions will re-locate off Airport in a manner that siphons revenues away from the Airport.

Commercial Ground Transportation Operators benefit from the operation and development of the Airport as a whole, as the flow of air travelers who use Airport facilities creates a pool of potential customers for such ground transportation operators. In setting fees, the Authority considers the benefit conferred on various classes of Commercial Ground Transportation Operators due to the development, operation and maintenance of the entire Airport. The Authority may also consider the nature of the businesses that provide commercial ground transportation services, the use of airport facilities by particular types of commercial ground transportation providers, and the direct and indirect impact on airport revenues from imposing fees on various ground transportation providers. While the Authority will establish fee structures that apply consistently within categories of users, consideration of the various factors may well lead to differences in fee structures among different types of users, consistent with federal and state requirements.

Pursuant to the federal "self-sustaining" mandate and the power granted to it by the Metropolitan Airport Authority Act (TCA 42-4-101 et seq.), the Authority has established charges for the use of the Airport by Commercial Ground Transportation Operators.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

A.   The Authority's "Rules and Regulations for the Use of Airport Facilities", which may be revised from time to time, shall apply to all Commercial Ground Transportation Operators.

B.   Access to Airport facilities will be available without unjust discrimination, subject to limitations established by the Operations Division of the Authority, to promote convenient and efficient operations to all Commercial Ground Transportation Operators holding the appropriate permit from the Authority. Operators must first obtain any applicable license, permit, or authorization required by any other governmental entity.

C.   The Authority will charge a fee and will require insurance for the issuance of a Permit. Permits for Commercial Ground Transportation Operators will be issued based on classifications set forth in APPENDIX "D" of this Policy.

D.   Authority rates and charges for Commercial Ground Transportation Operators shall be reviewed and maintained by the Authority's Commercial Development Department with the approval of the President, Chief Operating Officer and legal counsel. Rates and charges shall be applied to each class of operator in a nondiscriminatory manner as set forth in APPENDIX "F" of this Policy. Rates and charges shall be subject to periodic review and adjustment in accordance with the Authority's policy of review and notification.

E.   Rates charged to the public, points of service and scheduled operations will be at the discretion of each Commercial Ground Transportation Operator. A copy of charges to the public, points of services, and scheduled ground transportation operations for Class I Operators based at the airport shall be provided to the Authority.

F.   The adoption of this Commercial Ground Transportation Policy is not intended, nor should it be construed, to grant any property right or expectation to any person or company whatsoever. The Authority expressly reserves the right to amend this Policy at any time and in any respect, as well as reserving the right to amend any agreements entered into pursuant to its terms. The Authority reserves the right to limit or restrict access to any area of the Airport, without the issuance of prior notice, for reasons including, but not limited to, safety and security of the general public, construction or renovation work at the Airport, acts of God, or nonpayment of fees.

G.   Any person who invests time or financial resources in the provision of Commercial Ground Transportation Service at the Airport does so at its own risk, and shall have no right or standing to make any claim whatsoever against the Authority by reason of any subsequent amendment to this Commercial Ground Transportation Policy, any amendment to an agreement, or any limitations or restriction of access to the Airport.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 62 of 102 PageID #: 73

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# SECTION II

## RULES AND REGULATIONS

The policy establishes operating rules and regulations for all types of Commercial Ground Transportation Services at the Airport, including but not limited to Charter Buses, Courier/Package Delivery Services, Courtesy Vehicles, Fixed Base Operator (FBO) Shuttles, Hotel/Motel/Corporate Shuttles, Limousines, Occasional Users, Public Transit Systems, Rental Car Shuttles, Shuttle Service Operators, Sightseeing Services, Special Event Transporters, Taxicabs, Transportation Network Companies, Peer-to-Peer Car Sharing and Valet Parking Shuttles.

The provision of Commercial Ground Transportation Services at the Airport shall be governed by all applicable laws and ordinances, executed licenses, agreements and permits, by the Authority's Rules and Regulations For The Use of Airport Facilities (as revised from time to time) and by the provisions of these Rules and Regulations, as the same may be amended from time to time. All persons engaged in Commercial Ground Transportation Service at the Airport, whether as Operator, Driver, employee or representative of an operator, or otherwise, shall at all times comply with the provisions of these Rules and Regulations. Any person who in any capacity engages in Commercial Ground Transportation Service at the Airport in such a manner as to violate any provision of these Rules and Regulations is subject to enforcement actions as herein provided, in addition to any civil, criminal or administrative sanctions otherwise established.

Commercial Ground Transportation Operators shall not engage in any discrimination, either in employment or in providing ground transportation service, on the basis of race, color, religion, sex, age, socioeconomic status, handicapping condition, or national origin as provided in Title 49, C.F.R. Part 21, Non-Discrimination in Federally Assisted Programs of the Department of Transportation, Title VI of the Civil Rights Act of 1964, and all federal regulations promulgated to achieve non-discrimination with respect to such services.

Commercial Ground Transportation Operators are responsible for the conduct and actions of their drivers, including compliance with all rules of conduct, regardless of whether such drivers are deemed by the Operator to be an employee or an independent contractor of the Operator. In considering any fine, suspension or revocation of operating privileges, the Authority may consider actions taken by the Operator to act responsibly, take disciplinary measures, mitigate damage, or otherwise take appropriate corrective action. Nevertheless, Commercial Ground Transportation Operators are ultimately accountable for the actions of their drivers as it relates to this Commercial Ground Transportation Policy.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 63 of 102 PageID #: 74

# SECTION III

## CLASSIFICATION OF OPERATORS

Commercial Ground Transportation Operators who provide Commercial Ground Transportation Service at the Airport are required to obtain a Permit issued by the Authority if an Operator's vehicle(s) access the Airport, the Ground Transportation Center or any parking facility of the Airport more than two (2) times per month during any given month.

Prior to engaging in the transportation of passengers or property at the Airport, Commercial Ground Transportation Operators are required to obtain a Permit authorizing the specific activity to be engaged in by the Commercial Ground Transportation Operator according to classifications set forth in APPENDIX "D" of this Commercial Ground Transportation Policy.

# SECTION IV

## FEES AND CHARGES

The Authority has set fees in accordance with principles outlined in the introduction of this policy for various categories of commercial providers. It is the policy of the Authority to review the fees and charges set forth in APPENDIX "F" of this Policy on an annual basis and to adjust such fees as deemed appropriate. Factors considered by the Authority in conducting such review include, but are not limited to, the following:

A.   Promoting safe and efficient use of limited Airport facilities;

B.   The benefit conferred on the various classes of Commercial Ground Transportation Operators due to the development, operation, and maintenance of the entire Airport;

C.   The use of the Airport by the various classes of ground transportation providers (not limited to use of roadways on which their vehicles traverse, but use of the entire airport that generates the pool of customers for the providers);

D.   Increases or decreases in the use of Airport facilities by various categories of commercial ground transportation providers;

E.   Congestion on Airport roadways;

F.   The need to preserve or generate revenues for the Airport; and

G.   Not discriminating against interstate commerce.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

The Authority has implemented an Automated Vehicle Identification (AVI) System which identifies trips made by permitted Commercial Ground Transportation Operators. The Authority provides Commercial Ground Transportation Operators two (2) options for the payment of the fees and charges due under the Commercial Ground Transportation Policy. Each Commercial Ground Transportation Operator, excluding TNC Operators that report vehicle activity utilizing an Authority approved Geo-fence and Peer-to-Peer Car Sharing Operators who submit a Monthly Report, are required to have an AVI account. As part of the application process for an AVI account, Commercial Ground Transportation Operators must pay a nonrefundable application fee of $50.00, plus a registration fee of $50.00 (consisting of a Decal Fee of $5.00, an AVI Transponder Tag Fee of $25.00 and a Commercial Vehicle Registration Fee of $20.00) for each Commercial Vehicle to be operated at the Airport.

Billing for the payment of the fees and charges due by Commercial Ground Transportation Operators shall be based on an Automated Payment (Auto-Pay) Option or a Self-Pay Option. Auto-Pay Operators who elect to pay their account by credit card or designated bank account, to be charged on or about the 5th of the month following the AVI activity, are eligible for a 5% discount on fees incurred during that month. Self-Pay Operators will be invoiced immediately following the end of the month with payment due on or before the 15th of the month following the AVI activity. The Authority reserves the right to require a Deposit of a Commercial Ground Transportation Operator that fails to maintain a valid credit card of record, active bank account with sufficient funds at the time of draw, or to remit payment in a timely manner. "Timely manner" is considered receipt of payment on or before the 15th of the month following the AVI or Geo-fence activity.

If a Commercial Ground Transportation Operator's account balance becomes past due, the operator's ground transportation privileges will be suspended. Accounts that have been suspended will be re- evaluated for any additional deposit or minimum balance requirement prior to being reinstated. Suspended accounts will not be reinstated until delinquent amounts have been paid and deposit requirements have been met. Commercial Ground Transportation Operators who continue to make trips from the Airport after being suspended shall be fined and/or subject to revocation, as provided in Appendix "C", sections 3 and 4.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 65 of 102 PageID #: 76

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# SECTION V

## MINIMUM INSURANCE REQUIREMENTS

Commercial Ground Transportation Operators shall maintain minimum insurance requirements established by the Authority in APPENDIX "E" of this Policy; however, should agencies of the United States Federal Government, the State of Tennessee or other governmental agencies require or modify insurance requirements to amounts greater than those set by the Authority, it shall be the Commercial Ground Transportation Operator's responsibility to obtain such coverage as may be required without notification from the Authority.

In addition to minimum insurance requirements established by the Authority, Commercial Ground Transportation Operators and Individual Taxicab Drivers shall be in compliance with rules and regulations established by the Transportation Licensing Commission of the Metropolitan Government of Nashville and Davidson County (MTLC), including minimum insurance requirements. The Authority does not regulate individual drivers for Commercial Ground Transportation Operators, including Individual Taxicab Drivers. MTLC has regulatory authority for the licensing and permitting of drivers for Commercial Ground Transportation Operators and Individual Taxicab Drivers. The Authority shall not abridge MTLC's regulatory authority, including the enforcement of minimum insurance requirements for Individual Taxicab Drivers. Nevertheless, the Authority requires that all Commercial Ground Transportation Operators, including Taxi Operators, meet the minimum insurance requirements established by the Authority.

# SECTION VI

## APPLICATION

Prior to engaging in the transportation of passengers or property at the Airport, Commercial Ground Transportation Operators are required to submit a completed application described in APPENDIX "H" of this Commercial Ground Transportation Policy, and, except for TNC and Peer-to-Peer Car Sharing Operators, submit a list of vehicles which will be providing Airport services, including vehicle make, model, color, year of manufacture, vehicle length, seating capacity, license number and vehicle identification number (VIN).

With regard to TNC Operators utilizing an Authority approved Geo-fence to report vehicle activity, the Operator shall demonstrate to Authority that the Operator's TNC mobile application technology ("Mobile App"), used for its business operations at the Airport, has incorporated a virtual perimeter of all Airport property together with TNC's Authority approved Geo-Fence in the Mobile App to alert TNC Drivers as to when they have entered upon Airport property and when they have entered and exited TNC's Geo-fence area at the Airport.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 66 of 102 PageID #: 77

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# SECTION VII

## REFERENCES & REVISION HISTORY

**References**

| | |
|---|---|
| 49 U.S.C. 47107 | Project grant application approval conditioned on assurances about airport operations |
| TCA 42-4-101 | Metropolitan Airport Authority Act |
| 24-004 | Rules and Regulations for the Use of Airport Facilities |
| Title 49, C.F.R. Part 21 | Non-Discrimination in Federally Assisted Programs of the Department of Transportation |
| Title VI | Civil Rights Act of 1964 |

**Revision History**

| | |
|---|---|
| 1/1/17 | Prior Issue |
| 1/1/20 | Updated Format, Titles & Descriptions<br>Revised Appendix "C" - Fine Amounts and Subsequent Actions<br>Revised Appendix "E" - Insurance Requirements<br>Revised Appendix "F" - Class III, Class V, Class XI<br>Revised Appendix "H" - Application Instructions |
| 10/1/20 | Updated Format, Titles & Descriptions<br>Revised Appendix "A" – Definitions<br>Revised Appendix "D" – Class XII<br>Revised Appendix "F" – Class I, Class XII<br>Added Appendix "I" – Ground Transportation Maps |

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 67 of 102 PageID #: 78

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "A"

## DEFINITIONS

When used in this Commercial Ground Transportation Policy the following words and phrases shall have the meaning set forth in this section unless the context clearly indicates that a different meaning is intended:

| | |
|---|---|
| Administrative Action | Any Fine, Suspension or Revocation of Driver or Commercial Ground Transportation Operator privileges imposed for the violation of Rules or Regulations or other law, statute or ordinance of Governmental Agencies. |
| Airport | Nashville International Airport. |
| Airport Based Operator | Commercial Ground Transportation Operators leasing space in the Terminal or Terminal adjacent facilities, including but not limited to the Consolidated Rental Car Facility, Ground Transportation Center, and parking facilities. |
| Arrivals Level Drive | The center level roadway of the Terminal. |
| Authority | The Metropolitan Nashville Airport Authority |
| Automated Payment ("Auto- Pay") Option | This payment option authorizes the Authority to charge the Commercial Ground Transportation Operator's credit card or bank account on file for all fees, charges or other costs incurred by the Commercial Ground Transportation Operator during the preceding month. These Operators are eligible for a 5% discount on the invoice amount provided electronic payment is successfully processed. This discount will not apply should the automated payment fail to process due to insufficient funds, failure to maintain an active credit card on file, or for other fault of the Commercial Ground Transportation Operator. |
| Automatic Vehicle Identification (AVI) System | A computerized automatic vehicle identification system installed by the Authority which monitors Commercial Vehicle activity on Airport roadways, in the Ground Transportation Center, and parking facilities. |
| AVI Transponder Tag | A device owned and installed by the Authority on each Commercial Vehicle associated with and under the control of Commercial Ground Transportation Operators authorized to provide Commercial Ground Transportation Services at the Airport for the purpose of recording vehicle trip activity. |

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 68 of 102 PageID #: 79

| | |
|---|---|
| Chief Operating Officer (COO) | The designated representative of the Authority, with direct responsibility for day-to-day operations of the Airport. |
| Commercial Ground Transportation Operator | Any entity engaged in any type of Commercial Ground Transportation Service as classified in APPENDIX "D" of this Commercial Ground Transportation Policy. |
| Commercial Ground Transportation Service | The act of providing the carriage of persons or property to or from the Terminal in a Commercial Vehicle. |
| Commercial Loading Zones | Designated areas for the loading or unloading of passengers and property for Commercial Vehicles. |
| Commercial Vehicle | Any motor vehicle engaged in transporting persons or property as a business activity, regardless of whether the customer pays a charge for such service directly or indirectly. Examples of Commercial Vehicles include, but are not limited to, taxicabs, limousines, courtesy vehicles, delivery vehicles, shuttle service vehicles, vehicles operated by TNC Drivers and chartered or scheduled buses or motor coaches. |
| Courtesy Vehicle | A Commercial Vehicle, regardless of size, utilized by off- Airport businesses, including, but not limited to, parking facilities, hotels, motels, rental car companies, corporate operators, fixed base operators, food service facilities, shopping centers and attractions, for the carriage of persons between the Airport and such business or some other destination, whether or not the passenger pays a direct charge for the service. |
| Courier/Package Service Operator | Operators of Commercial Vehicles for transportation of small packages, parcels, and/or luggage to or from the Airport. |
| Cruising | The unauthorized act of picking up or attempting to pick up passengers or fares in any location other than Commercial Loading Zones. |
| Customer Service Representative | An Authority employee empowered to supervise and control Commercial Vehicle activities, enforce rules and regulations of the Authority, and assist the traveling public in utilizing Commercial Ground Transportation Services. |

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 69 of 102 PageID #: 80

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

| | |
|---|---|
| Decal | A sticker issued by the Authority for the purpose of identifying various Commercial Vehicles. |
| Deposit | Security required for Operator's full, faithful and prompt performance of and compliance with all covenants, terms and conditions of an agreement with the Authority. The amount of the Deposit shall be an amount determined by the Authority sufficient to protect the interests of the Authority in the event of nonpayment by the Commercial Ground Transportation Operator. The Authority will review all deposits held no less than annually and adjust the deposit amount to meet these requirements. Any adjustment to the Deposit will be debited or credited through the operators account and invoiced accordingly. A Commercial Ground Transportation Operator who fails to pay his account in a timely manner shall be required to provide a Deposit in the form of cash or a cashier's check to guarantee payment of all fees, charges and other costs in accordance with the Commercial Ground Transportation Policy. "Timely manner" is considered receipt of payment on or before the 15th of the month following the AVI activity. |
| Driver | The person operating a Commercial Vehicle. |
| Excessive Dwell Time Charge | An additional fee assessed of a Commercial Ground Transportation Operator for exceeding the authorized limit of twenty (20) minutes for use of the Ground Transportation Center, or such other period of time as may be established by the Authority for use of these facilities. |
| Excess Vehicle Charge | An additional charge assessed of a Commercial Ground Transportation Operator, excluding Taxis and TNCs, for exceeding the maximum number of two (2) Commercial Vehicles authorized in the Ground Transportation Center at any one time. |
| Extra-Large Commercial Vehicle | A Commercial Vehicle measuring 24 feet or more in length or 9 feet or more in width and/or having a seating capacity for more than thirty-one (31) occupants, inclusive of the Driver. |
| Geo-Fence | A virtual perimeter or perimeters for TNC Operators. A TNC Operator shall at all times be able to demonstrate to Authority that it has installed Authority-approved Geo-fence monitoring software that is triggered by or with the TNC Mobile App that allows Authority to track TNC Drivers upon entrance and travel within the Geo-Fence area of the Airport. |
| Governmental Agency | Any governmental office, legislative body or agency with jurisdiction over activities of Drivers, Commercial Ground Transportation Operators of the Airport. |

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 70 of 102 PageID #: 81

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

Gross Revenues — All sums paid or payable to Commercial Ground Transportation Operators for services provided to patrons picked up at or delivered to the Airport. Gross Revenues shall <u>not</u> include federal, state, or municipal sales or other similar taxes separately stated and collected from such customers; nor insurance proceeds or other amounts received on account of loss, conversion, or abandonment of vehicles or other property of Operator; nor any sums received from disposal of capital assets and/or trade fixtures. No deduction shall be allowed from Gross Revenues for Airport user-fees, bad debts, or any other operating expense, including franchise taxes, or taxes levied on activities, facilities, equipment, or real or personal property of Operator. No deductions from Gross Revenues other than those specifically authorized by a written agreement or permit with the Authority will be allowed.

Ground Transportation Center (GTC) — Located on Level 1 of Terminal Garage 2, the Ground Transportation Center (GTC) consists of multiple lanes designated by the Authority as Commercial Loading Zones for use by Commercial Ground Transportation Operators. The current layout of the GTC in APPENDIX "I" identifies those areas designated by the Authority for specific Commercial Ground Transportation Operators.

Holding Areas — Designated locations where authorized Commercial Vehicles may wait for eventual access to designated Commercial Loading Zones.

Large Commercial Vehicle — A Commercial Vehicle measuring 24 feet or more in length or 9 feet or more in width and/or having a seating capacity of not less than sixteen (16) nor more than thirty (30) occupants, inclusive of the Driver.

Limousine — A Commercial Vehicle for hire which may have an extended wheelbase and seating capacity for up to fifteen (15) occupants, inclusive of the Driver, with unmetered rates predetermined on a point-to-point basis, and licensed as a Limousine by the MTLC and operated pursuant to a Permit issued by the Authority on routes from the Airport to specified destinations on a prearranged basis.

Mid-Size Commercial Vehicle — A Commercial Vehicle measuring 24 feet or more in length or 9 feet or more in width with a seating capacity of not less than seven (7) nor more than fifteen (15) occupants, inclusive of the driver.

Monthly Report — Shall mean a monthly report prepared by a Commercial Ground Transportation Operator, and submitted to the Authority, containing data including but not limited to date, origin, destination, trips, trip duration, and Gross Revenues.

| | |
|---|---|
| MTLC | The Transportation Licensing Commission of the Metropolitan Government of Nashville and Davidson County |
| Occasional Operators | Commercial Ground Transportation Operators who use the Airport or access the Ground Transportation Center at a frequency of not more than two (2) times during any given month. |
| Off-Airport Commercial Ground Transportation Operator | Any entity, other than an Airport Based Operator, engaged in Commercial Ground Transportation Services as classified in APPENDIX "D" of this Commercial Ground Transportation Policy. |
| On-Call or On-Demand | Shall mean transportation arrangements made indiscriminately and instantaneously with a request for service which includes, but is not limited to, the hailing of a taxicab or any other oral request for transportation service made from a public vehicular holding or waiting area. No passenger vehicle for hire, other than a Taxicab, may be operated at the Airport on an On-call or On-demand basis. |
| Peer-to-Peer Car Sharing | The authorized use of a vehicle by an individual other than the vehicle's owner through a platform that connects motor vehicle owners with drivers to enable the sharing of motor vehicles for financial consideration. |
| Permit | Permit or License issued by the Authority authorizing a Commercial Ground Transportation Operator to engage in specific Commercial Ground Transportation Services. |
| Person | Any corporation, person, partnership, joint venture, or other legal entity. |
| Pre-approved Route | Means a fixed route, with predetermined fixed pick-up and drop-off points, approved in advance by and on file with the Authority. |
| Pre-arrangement | Shall mean a request for transportation of a specific passenger by registration in advance of boarding from a specified location, including pre-arrangement directly with a passenger vehicle for hire service or pre-arrangement through a third-party guest service desk, concierge desk or internet based technology application. Such registration must have been made by contacting the passenger vehicle for hire service before the vehicle for hire was dispatched to render the transportation service. |
| President | The President of the Authority or their designated representative. |

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

| | |
|---|---|
| <u>Private Vehicle</u> | A vehicle transporting persons or property, for which no charge is paid directly or indirectly by the passenger or by any other person, and the operation of which is not associated with the business purpose of such operator. |
| <u>Revocation</u> | The discontinuance of a Commercial Ground Transportation Operator's Permit. |
| <u>Rules and Regulations</u> | The Authority's Rules and Regulations for The Use Of Airport Facilities, and the Rules and Regulations set forth in Section II of this Policy implemented to carry out the purpose and intent of this Policy, as may be amended from time to time. |
| <u>Service Drive</u> | Restricted area for authorized users to conduct deliveries for airport tenants and/or vendors. Authorization for use of the Service Drive will be at the discretion of the Chief Operating Officer or Director of the Department of Public Safety and/or their duly designated representative. |
| <u>Self-Pay Option</u> | Self-Pay Operators will be invoiced immediately following the end of the month with payment due on or before the 15th of the month following the AVI activity. The Authority reserves the right to require a Deposit of a Commercial Ground Transportation Operator that fails to remit payment in a timely manner. "Timely manner" is considered receipt of payment on or before the 15th of the month following the AVI activity. |
| <u>Shared Car Driver</u> | An individual who has been authorized to drive a shared car by a Shared Car Owner under a car sharing agreement. |
| <u>Shared Car Owner</u> | The registered owner(s), or a person designated by the registered owner, of a vehicle made available for sharing to Shared Car Drivers through a peer-to-peer car sharing program. |
| <u>Shuttle Service</u> | A passenger vehicle for hire service that provides only shuttle transportation to or from prescribed locations on a pre-approved route with unmetered rates predetermined on a point-to-point basis and operating under a Permit issued by the Authority. |
| <u>Shuttle Vehicle</u> | A Commercial Shuttle Service Vehicle having a seating capacity of not more than 15 persons, inclusive of the Driver, limited to a shuttle vehicle lettered as a shuttle which uses routes pre-approved by the Authority. |

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

| | |
|---|---|
| Small Commercial Vehicle | Commercial Vehicle measuring less than 24 feet in length or 9 feet in width and having a seating capacity for up to six (6) persons, inclusive of the Driver. |
| Solicitation | Initiating a conversation with any person while on Airport property for the purpose of seeking to obtain passengers for a Commercial Ground Transportation Service. |
| Special Event Transporters | Operators of motor vehicles, regardless of vehicle size, who transport passengers to and/or from the Airport and prearranged special events off the Airport, conducted by parties other than the host of the special event. |
| Suspension | The non-permanent discontinuance of a Commercial Ground Transportation Operator's Permit. |
| Taxicab | A chauffeur-driven Commercial Vehicle, measuring less than 24 feet in length or 9 feet in width with a seating capacity for up to six (6) persons, inclusive of the Driver, which is equipped with a meter to determine passenger fares, and which provides on demand service over routes determined by the destination of the passenger pursuant to a license issued by the MTLC. |
| Terminal | The main landside passenger terminal building of the Airport. |
| Ticketing or Departure Level Drive | The upper third-level roadway of the Terminal. |
| Trade Dress | A visual image and specific design, approved by the Authority, utilized by Commercial Ground Transportation Operators to distinguish its' product or service and identify the Commercial Ground Transportation Operator. |
| Transportation Network Company (TNC) | A company or organization, duly licensed as a TNC by the MTLC and the Authority, which uses a digital platform to connect passengers with prearranged transportation services for hire provided by drivers using their personal vehicles. |
| TNC Driver | Shall mean a person who meets the qualifications for a driver's permit under guidelines established by the MTLC and the Authority, who is under contract with a TNC to provide transportation services for hire, by use of their personal vehicle, to passengers connected to the TNC Operator by pre-arrangement through the TNC's digital platform. |

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 74 of 102 PageID #: 85

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

| | |
|---|---|
| TNC Driver Digital ID | TNC Drivers shall obtain a TNC issued Digital ID which shall be available on the Driver's mobile device which shall allow the Authority to confirm driver identity by color photo, vehicle make, model and color photo, license plate number, certificate of insurance, vehicle location on street map in real time and the electronic equivalent of a waybill that meets criteria set forth in the License Agreement or Permit issued by Authority to TNC. |
| TNC Mobile App | Shall mean the smart phone mobile application technology ("Mobile App") utilized by a TNC to conduct business operations at the Airport subject to Authority's review and approval. |
| TNC Vehicle | A passenger vehicle for hire that is a personal vehicle measuring less than 24 feet in length and 9 feet in width, having a seating capacity for up to eight (8) persons, inclusive of the Driver, and under the legal control of a TNC Operator to provide prearranged transportation for hire to passengers connected to the TNC Operator using the TNC's digital platform. |
| Trip Charge | The fee, as referenced in APPENDIX "F", that is assessed for a trip to and/or from the Airport. |
| Timely Payment | Receipt of payment on or before the 15th of the month following the AVI/Geo-fence activity. |
| Waybill | As evidence of pre-arrangement of transportation pickup service for a specific passenger, Commercial Drivers shall be in possession of, and willing to produce, a physical or electronic Waybill generated prior to accessing the Airport, or in the case of TNC Drivers the Geo-fence area, which contains the following information: (i) name of the party to be transported, (ii) pick up location, (iii) the arrival time of the party and (iv) the date and time the charter was originally arranged. |

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "B"

## RULES OF CONDUCT

The Authority's "Rules and Regulations for the Use of Airport Facilities", which may be revised from time to time, shall apply to all Commercial Ground Transportation Operators.

1. Permit Required

   All Commercial Ground Transportation Operators conducting Commercial Ground Transportation Services at the Airport are required to obtain a Permit issued by the Authority if an Operator's vehicle or vehicles, taken in aggregate, are operated on the Airport or access the Ground Transportation Center in excess of two (2) times per month during any given month. Permits issued by the Authority shall authorize the specific activity to be engaged in by the Commercial Ground Transportation Operator. Any Driver providing services under a License or Permit issued to a Commercial Ground Transportation Operator shall be deemed by the Authority to be an agent of the Commercial Ground Transportation Operator, regardless of the driver's status (i.e. employee, independent contractor, agent, etc.) with the Commercial Ground Transportation Operator.

2. Insurance Required

   Commercial Ground Transportation Operators will maintain minimum insurance requirements as set forth in APPENDIX "E" of this Policy; however, should agencies of the United States Government, the State of Tennessee or other Governmental Agencies require insurance amounts greater than those listed therein, it shall be the Commercial Ground Transportation Operator's responsibility to obtain and maintain such coverage as may become required.

3. Automatic Vehicle Identification (AVI)/Geo-Fence System Compliance

   Commercial Ground Transportation Operators, other than TNC Operators and Peer-to-Peer Car Sharing Operators, must comply with all procedures established by the Authority with respect to the use of an AVI System installed by the Authority. Prior to commencement of service an AVI Transponder-Tag will be installed by the Authority on each Commercial Vehicle, other than TNC Vehicles, providing Ground Transportation Services at the Airport. Commercial Ground Transportation Operators shall not modify, adjust, or otherwise tamper with the AVI Transponder-Tag after installation. Each vehicle outfitted with an AVI Transponder-Tag is to be assessed a charge at the Authority's then current rate. All Commercial Ground Transportation Operators are responsible for the safety and security of each AVI Transponder-Tag assigned to their vehicle(s) and shall be required to pay a replacement fee for lost or stolen transponders. All Commercial Ground Transportation Operators and their agents shall promptly report any Transponder-Tag which is malfunctioning or not properly operating.

   Commercial Ground Transportation Operators, other than TNC Operators and Peer-to-Peer Car Sharing Operators, shall keep the Authority advised of any and all changes in Commercial Vehicles serving the Airport.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

Operators shall call or email the Operations Landside Coordinator at (615) 275-1657 or AVI@flynashville.com to coordinate installation or removal of AVI Transponder-Tags.

TNCs and all TNC Drivers, employees, and/or agents shall at all times comply with the rules set forth in the License Agreement issued by Authority regarding entrance into and from the Geo-fence area at the Airport. TNCs will use the Geo- fence area to monitor and track TNC Drivers using the TNC Mobile App to service Airport related passengers. TNCs will ensure that each TNC Driver shall leave the Geo-fence area expeditiously after discharging a passenger.

4.  Licenses/Permits/Certificates

    Each Commercial Ground Transportation Operator, where applicable, shall obtain any license, permit or authorization required by any other Governmental Agency prior to applying for a Permit with the Authority. Failure to obtain or maintain any required license, permit or authorization required by any other Governmental Agency shall be grounds to revoke or deny privileges to conduct ground transportation operations with the Authority.

5.  Display of Decals, Transponders and/or Trade Dress on Vehicles

    Prior to commencement of service, Commercial Ground Transportation Operators must have the required Decals, Transponders or Trade Dress, issued by Authority or the Commercial Ground Transportation Operator , affixed to Commercial Vehicles at all times in the manner prescribed by the Authority. Temporary permits issued by the Authority will be displayed in the front windshield at all times.

    Prior to commencement of service at the Airport, the Commercial Ground Transportation Operator must provide Authority with proposed graphics and a description of the Operator's Trade Dress and/or decal, along with the location on the vehicles; all of which must be approved by Authority.

6.  Failure to Maintain or Tampering with AVI Transponders and/or Mobile Apps

    Commercial Ground Transportation Operators are required to maintain an operating Authority issued AVI transponder or Authority approved vehicle trade dress and TNC Digital ID on the TNC Driver's mobile device, on or within, each vehicle operated at the Airport. Operators are required to immediately report any transponder or TNC Digital ID that is not operating properly. Failure to maintain a transponder or TNC Digital ID in a Commercial Vehicle may be subject to a $500 fine, plus Authority's estimate of any lost revenues. In addition, the Authority may take other administrative action as it deems appropriate, including suspension or permanent revocation of all ground transportation privileges.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 77 of 102 PageID #: 88

7.   Continued Operation after Suspension

Any Operator who continues to conduct ground transportation operations at the Airport while under suspension shall not be entitled to the five percent (5%) discount on AVI fees. In addition, the Authority may take such other administrative action as Authority deems appropriate, including, but not limited to further suspension, fines or permanent revocation of all ground transportation privileges.

8.   Traffic Control and Enforcement

Commercial Ground Transportation Operators must obey all rules of driving courtesy, speed, and safe operation at all times. All Commercial Ground Transportation Operators shall be subject to on-site traffic control and enforcement directives issued by Department of Public Safety Officers, Operations Management and staff, Customer Service Agents, or such other personnel as may be designated by the President or his or her designated representative

9.   Loading Requirements

All Commercial Vehicles waiting to load passengers must be positioned in spaces designated by the Authority for vehicles of that type. Drivers are prohibited from loading/unloading in crosswalks and in through lanes. Drivers are expressly prohibited from double parking to load or unload passengers and their luggage. While occupying designated loading areas in the Ground Transportation Center all Commercial Vehicle Drivers shall turn off their vehicle engines unless they are engaged in active loading.

10.   Loading/Unloading in Ground Transportation Center

Access to the Ground Transportation Center is limited to Commercial Vehicles authorized by the Authority.  Loading and unloading of passengers in this area is permissible.

11.   Loading on Arriving Level Drive

The Arriving Level Drive shall only be used for loading by non-commercial Private Vehicles.  The COO, or his designee, may authorize Commercial Vehicles to load on the Arriving Level Drive under extraordinary circumstances on terms and conditions to be uniformly applied.

12.   Unloading on Arriving Level Drive

Unloading of Commercial Vehicles is prohibited on the Arriving Level Drive.

13.   Loading on Ticketing Level Drive

Commercial Vehicles shall not be permitted to load passengers on the Ticketing Level Drive, except upon specific authorization of the COO or his designee on terms and conditions to be uniformly applied.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

14.   Unloading on Ticketing Level Drive

The Ticketing Level Drive is used for unloading of passengers by Private and Commercial Vehicles. However, unloading by Commercial Vehicles, including TNC Vehicles, is restricted to Commercial Loading Zones.

15.   Maximum Number of Vehicles

Commercial Ground Transportation Operators who operate more than two (2) Commercial Vehicles in the Ground Transportation Center at any one time, are subject to an Excess Vehicle Charge, as outlined in Appendix "F," except upon specific authorization of the Chief Operating Officer or his designee on terms and conditions to be uniformly applied.

16.   Exterior Condition of Vehicle

The exterior of Commercial Vehicles shall be maintained in a clean, undamaged condition and present a favorable appearance. Exterior shall include body paint, all glass, tires, hubcaps, head and taillights, grills, bumpers and body trim. Commercial Vehicles that have been damaged and remain drivable shall be given a two (2) week grace period to perform needed repairs, after which time the vehicle will be restricted from operating at the Airport until proper repairs are made.

17.   Interior Condition of Vehicle

The interior of approved Commercial Vehicles, including the trunk, shall be maintained in a condition so as to be free of grease, dirt and trash. Passengers shall be able to use the seats and trunk of the vehicles without fear of soiling or damaging either their wearing apparel or their luggage. Interior seat fabric must not be ripped. Commercial Vehicles shall be equipped with a fire extinguisher and functioning heating and air conditioning systems.

18.   Driver to Remain with Vehicle

Drivers of Commercial Vehicles shall not leave their vehicles unattended when parked in the Ground Transportation Center at the Airport.

19.   Personal Hygiene and Proper Dress for Driver

Driver and driver's clothing must conform to standards of personal hygiene and be clean, neat and sanitary. Drivers shall keep their hair, including facial hair, clean and neatly groomed at all times. Drivers shall be attired in a clean shirt or blouse with collar and slacks or skirt. Driver(s) shall wear shoes or dress boots with socks (sandals and shower clogs are not permitted).

20. <u>Conduct of Driver</u>

Commercial Ground Transportation Operators and their employees, including all Drivers, shall conduct operations in an orderly and proper manner so as not to annoy, disturb, or be offensive to customers, patrons, or tenants at the Airport.

21. <u>Courtesy of Driver</u>

Drivers will be courteous at all times and will assist passengers with their luggage in and out of their Commercial Vehicle. Drivers must be able to communicate effectively in English.

22. <u>Drinking/Gambling/Other Illegal Activities</u>

No Commercial Vehicle Driver shall be or become intoxicated or drunk, commit any act of nuisance, engage in or conduct any form of gambling, nor violate any federal, state, or local law on the Airport property.

23. <u>Cruising</u>

Cruising shall not be permitted. No Driver shall cruise Airport roadways in search of passengers and/or to await a space designated for Commercial Vehicles to become available.

24. <u>Loitering</u>

No Commercial Vehicle Driver may loiter or sleep on any part of Airport property.

25. <u>Disposal of Wastes</u>

Commercial Vehicle Drivers disposing of garbage, papers, refuse or other material on Airport property shall do so only in receptacles provided for that purpose; shall dispose of bodily wastes only in comfort stations and in a clean and sanitary manner; and shall not expectorate on floors, walls, or other surfaces of any Airport facility.

26. <u>Guidelines for Meet and Greet Services</u>

The Authority does hereby establish the following guidelines for Meet and Greet services to provide for expeditious movement of passengers through the Terminal.

a. All Commercial Ground Transportation Operators and companies providing Commercial Ground Transportation Services may meet and greet individuals or groups by the use of hand held signs within designated areas of the Terminal.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

b.      All services of this nature must be conducted in a manner that does not obstruct the normal flow of pedestrian traffic through the Terminal. Drivers must remain with their vehicles while in the Ground Transportation Center and are not permitted to help meet and greet personnel inside the Terminal building unless the Commercial Ground Transportation Operator has an employee remaining with the vehicle. Drivers may hold signs within the immediate vicinity of their vehicles provided the sign is consistent with hand held sign guidelines.

c.      Handheld signs may not exceed 10" x 12" in size. Signs must have either the name of the individual or group being met.  It must also have the name and logo of the ground transportation company, tour operator, etc., which shall not exceed 25% of the sign.  The sign is to be of professional quality; computer-generated signs are acceptable.

d.      Individuals conducting meet and greet services shall be prepared to provide information to Authority and law enforcement personnel about the individual or group being met (passenger's name, flight number, arrival time, etc. is required). Individuals found violating the meet and greet services will be required to discontinue their activities immediately.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 81 of 102 PageID #: 92

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "C"

## FINES, SUSPENSION AND REVOCATION OF OPERATING PRIVILEGES

Commercial Ground Transportation Operators are responsible for the conduct and actions of their drivers, including compliance with all rules of conduct. In considering any fine, suspension or revocation of operating privileges, the Authority may consider actions taken by the operator to act responsibly, take disciplinary measures, mitigate damage, or otherwise take appropriate corrective action. Nevertheless, Commercial Ground Transportation Operators are ultimately accountable for the action of their employees and drivers as it relates to this Commercial Ground Transportation Policy.

The Authority's Chief Operating Officer or their designee(s) may impose a fine, suspension, or revocation upon any Commercial Ground Transportation Operator or Driver of any Commercial Vehicle who, after due investigation, is found to have violated any of the rules and regulations contained herein.

1. <u>Violation of Permit</u>. Any violation of the Ground Transportation Policy, and the Rules and Regulations contained herein, will be considered a violation of the terms of the Permit issued by the Authority.

2. <u>Fines/Suspension.</u> In addition to all remedies provided by law, fines and/or suspensions may be imposed at the discretion of the Authority's Chief Operating Officer or their designee(s) for any violation of this Commercial Ground Transportation Policy including, but not limited to, all of the following:

   a. Loading/unloading in unauthorized zones.

   b. Unauthorized staging or waiting in loading zones.

   c. Soliciting fares, stationing or waiting in loading zones.

   d. Cruising.

   e. Disobeying regulatory signs.

   f. Refusal of fares, except under authorized conditions.

   g. Unprofessional or discourteous conduct and or use of profane language.

   h. Providing misleading information as to other ground transportation services or Commercial Ground Transportation Operators or altering or attempting to alter passenger's choice of service.

   i. Failure to pay applicable fees.

   j. Failure to obtain/maintain required Permits and licenses.

   k. Failure to obey the instructions of the Authority's representatives or agents or law enforcement personnel.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 82 of 102 PageID #: 93

l.     Obstructing roadways/double parking.

m.    Driving in an unsafe manner, including without limitation, speeding, backing of vehicles on airport roads, stopping in crosswalks to load or unload, or failure to yield to pedestrians.

n.    Violation of meet/greet rules.

o.    Continuing to conduct commercial ground transportation operations when privileges have been suspended.

p.    Any other violation of the policy, the Rules and Regulations, laws, statutes, or ordinances of any Governmental Agency.

3.    <u>Guidelines for Administrative Actions</u>.  Administrative actions of the Commercial Ground   Transportation Policy will be evaluated based on the specific circumstances of each violation. The severity, potential impact and number of offenses will be considered in any administrative action. Violations that have a potential   negative impact upon safety, business operations or customer satisfaction are considered serious infractions and will be dealt with more severely. Violations can result in the Authority imposing fines, suspension or revocation of Drivers or Commercial Ground Transportation Operators, or a combination thereof.  Unless otherwise stated in individual operating permits or agreements, the Authority has established the following guidelines for fines and or suspension.

> First offense ................... $50 fine and/or Suspension
> Second offense ............ $100 fine and/or Suspension
> Third offense .............. $250 fine and/or Revocation

> <u>Note:</u> The above listed fines are general guidelines for offenses. Depending on the severity of an incident, the Authority may impose a higher fine or other penalty for an offense. A Commercial Ground Transportation Service Company shall be responsible for payment of the fines of its Drivers which will be debited through the operators account and invoiced accordingly. Offense records will be kept on file for a minimum of twelve (12) months.

4.    <u>Revocation.</u> In addition to all other available  remedies, revocation  may be imposed at the discretion of the Authority's Chief Operating Officer or their designee(s) for any of the following:

a.    Any violation of these Rules and Regulations.

b.    Failure to pay applicable fines within ten (10) days of imposition or to abide by a Suspension of privileges.

c.    Failure to maintain all applicable permits and licenses.

d. Failure to maintain required insurance or to provide satisfactory evidence of coverage.

e. Failure of Driver to remain with a vehicle.

f. Overcharging customers.

g. Conduct detrimental to the orderly operation of the Airport.

h. Conducting illegal activities on Airport grounds that constitute a misdemeanor or a felony.

i. Conviction of a felony to the extent federal, state, or local laws, regulations or policy require such Revocation.

j. Failure to comply with rules and regulations established by the Transportation Licensing Commission of the Metropolitan Government of Nashville and Davidson County, including any minimum insurance requirements.

5. <u>Imposition and review of Administrative Actions and Revocations.</u>

Upon the imposition of an Administrative Action or the Revocation of an operating privilege, the Operator may dispute the imposition of the Administrative Action or Revocation of the operating privilege in writing to the Chief Operating Officer (COO) of the Airport, or his designee, provided that notice of such dispute is provided within three (3) business days of the imposition of the Administrative Action or Revocation. The COO of the Airport, or his designee, will advise the Operator or Driver of the time, date and place of the review, will review any matters submitted by the Operator or Driver and will thereafter provide notice to the Operator or Driver of any action taken after the review, which may include a decision not to impose any Administrative Action, imposition of a lesser Administrative Action, or other action appropriate under the circumstances. The determination of the COO shall constitute the final decision of the Authority.

6. <u>Operator- Requested Temporary Suspension of Permit.</u>

An Operator may request a temporary suspension of their Ground Transportation Permit for a period not to exceed 60 days, which is effective upon written approval from the Authority, which may approve or deny the request in its sole discretion.

## APPENDIX "D"

## OPERATOR CLASSIFICATIONS

Prior to engaging in the transportation of passengers or property at the Airport, Commercial Ground Transportation Operators are required to obtain a Permit authorizing the specific activity to be engaged in by the Commercial Ground Transportation Operator according to the following classifications:

1. Airport Based Limousine and Shuttle Operators

    Airport Based Operator of limousines and/or shuttles for hire operate pursuant to a concession or lease agreement issued by the Authority. Such Operators are required to enter into a space lease in the terminal or terminal adjacent facilities, and to pay the greater of a Minimum Annual Guarantee (MAG) or a percentage of gross revenue. The Authority, however, is under no obligation to provide counter space if none is available.

    Airport based limousine and shuttle operators are classified by the Authority as Class I Operators and are prohibited from holding any other class of permit or from sub-contracting, partnering or joint-venturing with any other class of Commercial Ground Transportation Operator without the express written approval of the Authority, which approval may be denied at the sole discretion of the Authority.

2. Courier/Package Delivery Service

    Contract operators of motor vehicles that transport small packages, parcels, and/or luggage to or from the airport.

    Note: Authorization for use of the Service Drive will at all times be at the discretion of the COO or his designee.

3. Hotel/Motel/Corporate Operators

    Operators of Courtesy Vehicles owned and/or operated by hotels, motels, or corporations that transport patrons to or from the Airport.

    Note: In the event a Hotel/Motel Operator elects to offer paid automobile parking to Airport passengers absent an overnight's stay at the Hotel/Motel, the Operator shall disclose such information in the appropriate section of the Permit Application Form as referenced in Appendix "H"; and, in addition to monthly permit fees and Trip Charges applicable to Hotel/Motel Operators, the Operator shall pay the Authority ten percent (10%) of Gross Revenues derived from such parking. In the event the Authority subsequently determines the Operator is offering paid parking to Airport passengers who were not an overnight guest at the Hotel/Motel, and the Operator has failed to report this fact to the Authority, the Operator shall be assessed Trip Charges applicable to Off-Airport Parking Operators retroactive to the effective date of its Permit.

4.      Occasional Operators

Commercial Ground Transportation Operators who conduct Commercial Operations at the Airport at a frequency of not more than two (2) times per month. Occasional Operators must submit an application for a temporary permit in order to conduct commercial operations at the Airport. A temporary permit and/or an AVI Transponder Tag will be issued for an Occasional Operator at the sole discretion of the Authority.

5.      Off-Airport Limousine Operators

Off-Airport based operators of Commercial Limousines for hire, operated pursuant to a License issued by the MTLC and the Authority, with unmetered rates predetermined on a point-to-point basis.

Note: Vehicles having a seating capacity of more than fifteen (15) seats, inclusive of the driver, shall be classified as Special Event Transporters.

6.      Off-Airport Parking Operators

Operators of Off-Airport parking facilities who operate Courtesy Vehicles which transport patrons to and/or from the Airport.

7.      Off-Airport Rental Car Operators

Operators of Off-Airport based rental car agencies that operate Courtesy Vehicles which transport patrons to and/or from the Airport.

8.      Off-Airport Shuttle Service Operators

Off-Airport based operators of commercial Shuttle Service Vehicles for hire having a seating capacity of up to fifteen (15) seats, inclusive of the driver, operated pursuant to a license issued by the MTLC and a permit issued by the Authority, with unmetered rates predetermined on a point-to-point basis.

Note: Vehicles having a seating capacity of more than fifteen (15) seats, inclusive of the driver, shall be classified as Special Event Transporters.

9.      Public Transit System

Motor vehicles operated directly by a non-profit governmental entity on a fixed route, fixed schedule, and fixed passenger fare, whose sole purpose is to provide public transportation for a confined area within the corporate limits of cities and suburban territory adjacent thereto. Public Transit Systems will operate vehicles in the Ground Transportation Center as prescribed by the Authority but are not assessed a fee to operate on the Airport.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

10. Special Event Transporters

Prearranged operators of motor vehicles that transport passengers between the Airport and special events off the Airport, conducted by a party other than the party hosting the event. A temporary permit or an AVI Transponder Tag may be issued for a Special Event Transporter at the sole discretion of the Authority.

11. Taxicab Operators

Motor vehicles equipped with a meter to determine passenger fares that operate on demand over routes determined by the destination of the passenger and licensed by the MTLC. As a condition to conducting business at the Airport, Taxicabs must be equipped to electronically accept, and must accept, all major credit cards, as well as, airline vouchers for payment of fares to and from the Airport.

12. Transportation Network Company (TNC)

A company or organization that uses a digital platform to connect passengers with pre-arranged transportation services for hire provided by drivers using their personal vehicles.

13. Peer-to-Peer Car Sharing Operator

A company or organization that uses a digital platform to connect passengers with vehicle owners to enable the sharing of motor vehicles for financial consideration.

14. Other Providers of Commercial Ground Transportation Service

Prior to engaging in the transportation of passengers or property at the Airport, Other Providers of Commercial Ground Transportation Services which are not classified under the existing Policy must submit a written proposal to the Authority's COO stating the type of service proposed and appropriate certificate, permits, etc., from federal, state, or local governmental agencies, as required. The Authority will review such proposal and provide a written response. Other Providers of Commercial Ground Transportation Service may not operate without prior written approval by the Authority.

In the event a Commercial Ground Transportation Operator offers services to the public which fall into more than one of the above defined Operator Classifications, the Authority reserves the right to reclassify the Operator and/or impose Trip Charges or such other user fees as may be applicable to the other activity offered or engaged in.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "E"

## MINIMUM INSURANCE REQUIREMENTS

1. All Commercial Ground Transportation Operators, with the exception of taxicab operators, shall maintain Commercial General Liability and Property Damage Insurance, inclusive of Contractual Liability, in an amount of not less than One Million Dollars ($1,000,000) and Automobile Liability Insurance in an amount of not less than Five Hundred Thousand Dollars ($500,000.00).

   All taxicab operators shall maintain Commercial General Liability and Property Damage Insurance, inclusive of Contractual Liability, in an amount of not less than One Million Dollars ($1,000,000) and provide evidence of Automobile Liability Insurance in an amount of not less than Three Hundred Thousand Dollars ($300,000.00) for each driver.

   The foregoing coverages shall be written on a combined single limit per occurrence basis.

2. Such insurance policies and endorsements must name the Authority, its Board of Commissioners, its officers, and its employees as an additional insured to the full extent of the Commercial Ground Transportation Operator's insurance coverage, but in no event less than the required minimum amount, and shall contain severability of interest or cross liability provision endorsement. All policies, endorsements, and Certificates of Insurance must include a waiver of subrogation against the Authority, its Board of Commissioners, officers and employees.

3. A Certificate of Insurance must be on file with the Authority prior to commencement of Airport service. The insurance certificate must include a schedule of covered vehicles or include blanket coverage for all vehicles operating pursuant to and under a valid permit and shall contain a severability of interest clause. The insurance certificate, endorsements and policies must name the Metropolitan Nashville Airport Authority, its Board of Commissioners, its officers, and its employees as additional insured. The insurance provider shall provide a thirty (30) day notice to the Authority prior to any decrease below the minimum required coverage, cancellation in coverage, or nonrenewal of coverage. The insurance company for holders MNAA issued Operator Permits shall be rated as "Excellent" (A-) or better (or as approved by the Authority's Chief Financial Officer) in the latest edition of Best's Key Rating Guide and be licensed to do business in the State of Tennessee.

4. The Commercial Ground Transportation Operator shall be responsible for providing a new Certificate of Insurance to the Authority prior to the expiration date of any previously provided Certificate of Insurance so as to prevent any lapse of coverage. If a lapse in coverage does occur, the Authority may fine, suspend, or revoke all operating privileges and require that the Commercial Ground Transportation Operator re-apply for permission to do business with the Authority.

Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 88 of 102 PageID #: 99

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "F"

## SCHEDULE OF FEES AND CHARGES

Note: Terms for the payment of fees set forth in this schedule will
be incorporated in the Permit issued to the Commercial Ground Transportation Operator.

## Class I, Airport Based Limousine and Shuttle Operators

Airport Based Limousine and Shuttle Operators shall pay space rentals, **plus** the greater of a Minimum Annual Guarantee or Eight Percent (8%) of the Operator's monthly Gross Revenues as contractually established with the Authority.

## Class II, Off-Airport Limousine Operators

The Commercial Ground Transportation Operator shall pay a per trip fee of $1.50 for Small Commercial Vehicles and $1.75 for Mid-Size Commercial Vehicles to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport passengers to the Airport.

**Note:** Vehicles having a seating capacity of more than fifteen (15) seats, inclusive of the Driver, shall be classified as a Class VII, Special Event Transporter.

## Class III, Occasional Operators

The Commercial Ground Transportation Operator shall pay a trip fee for each Commercial Vehicle operated at the Airport pursuant to a temporary permit equal to $25.00 for each trip to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport passengers to the Airport.

## Class IV, Off-Airport Parking Operators

The Off-Airport Parking Operator shall pay a trip fee based on the average preceding calendar year Hotel/Motel Operator trip fee, plus a $2.94 differential, for each trip to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport passengers to the Airport.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# Class V, Off-Airport Rental Car Operators

The Commercial Ground Transportation Operator shall pay a per trip fee of $1.50 for Commercial Vehicles to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $1.00 for trips to transport passengers **to** the Airport.; **plus**

Ten Percent (10%) of the Operator's monthly Gross Revenues as contractually established with the Authority.

# Class VI, Hotel/Motel/Corporate Operators

The Commercial Ground Transportation Operator shall pay a monthly fee for each Commercial Vehicle operated by the Commercial Ground Transportation Operator at the Airport pursuant to a Permit equal to $75.00 per month per Small Commercial Vehicle, $150.00 per month per Mid-Size Commercial Vehicle or $200.00 per month per Large Commercial Vehicle. Additionally, the Commercial Ground Transportation Operator shall pay a trip fee of $0.25 for each trip to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for trips to transport passengers to the Airport.

In the event a Hotel/Motel Operator elects to offer paid automobile parking to Airport passengers absent an overnight's stay at the Hotel/Motel, the Operator shall disclose such information on the Permit Application Form as referenced in Appendix "H" of Authority's Commercial Ground Transportation Policy; and in addition to applicable monthly permit fees and Trip Charges, the Operator shall pay the Authority Ten Percent (10%) of Gross Revenues derived from such parking. In the event the Operator fails to report this information and the Authority subsequently determines the Operator is offering paid parking to Airport passengers who are not overnight guests of the Operator, the Operator shall be assessed Trip Charges applicable to Off-Airport Parking Operators.

# Class VII - Special Event Transporters

The Commercial Ground Transportation Operator shall pay a trip fee for each Commercial Vehicle operated at the Airport pursuant to a Permit equal to $7.50 per trip for a Large Commercial Vehicle and $13.25 per trip for an Extra-Large Commercial Vehicle for each trip to transport passengers from the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport passengers to the Airport.

# Class VIII- Taxicab Operators

The Commercial Ground Transportation Operator shall pay $1.50 for each trip to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport passengers to the Airport.

# Class IX, Off-Airport Shuttle Service Operators

The Commercial Ground Transportation Operator shall pay a per trip fee of $1.50 for Small Shuttle Service Vehicles or $2.00 per trip for Mid-Size Shuttle Service Vehicles to transport passengers **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for trips to transport passengers to the Airport.

# Class X, Courier/Package Delivery Service

The Commercial Ground Transportation Operator shall pay a per trip fee of $1.00 for each trip to transport small packages, and/or parcels **from** the Airport. The Commercial Ground Transportation Operator shall pay $0.00 for each trip to transport packages, and/or parcels to the Airport.

# Class XI, Transportation Network Company

The Commercial Ground Transportation Operator shall pay a per trip fee, inclusive of Excess Dwell Time and Excess Vehicle Charges, of $4.00 to transport passengers **from** the Airport, and shall pay a per trip fee of $2.00 to transport passengers **to** the Airport. Effective January 1, 2021 the per trip fee to transport passengers **to** the Airport will increase to $3.00. Effective January 1, 2022 the per trip fee to transport passengers **to** the Airport will increase to $4.00.

# Class XII, Airport Based Peer-to-Peer Car Sharing

Airport Based Peer-to-Peer Car Sharing Operators shall pay space rentals, **plus** the greater of a Minimum Annual Guarantee or Five Percent (5%) of the Operator's monthly Gross Revenues as contractually established with the Authority until July 1, 2021, at which time the 5% of Gross Revenues shall be increased to Six Percent (6%).

# Class XII, Off-Airport Peer-to-Peer Car Sharing

Off-Airport Peer-to-Peer Car Sharing Operators shall pay the greater of a Minimum Annual Guarantee or Five Percent (5%) of the Operator's monthly Gross Revenues as contractually established with the Authority until July 1, 2021, at which time the 5% of Gross Revenues shall be increased to Six Percent (6%).

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# Other Fees and Charges

APPLICATION FEE ………………………….…………………………$50.00/Operator

DECALS ........................................................................................... $5.00/Vehicle

AVI TRANSPONDER TAG ................................................................ $25.00/Vehicle

VEHICLE REGISTRATION FEE ....................................................... $20.00/Vehicle

FAILURE OF AUTOMATED PAYMENT (for Auto-Pay Customers) ............... $30.00/Event

LATE PAYMENT FEE (for Self-Pay Operators) .................................................. $30.00/Event

EXCESSIVE DWELL TIME CHARGE ...........................................Trip Charge multiplied by 2 for each 10-minute increment exceeding 20 minutes for the use of the Ground Transportation Center.

EXCESS VEHICLE CHARGE……………………………………. **Double the Trip Charge**

FINANCE CHARGES **–** In the event any amount due and properly invoiced by the Authority is not received in a timely manner, finance charges shall be assessed beginning with the date of invoice at an annual percentage rate of 18% or the maximum amount allowed by law.

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# Appendix "G"

| Maximum Size and Seating Capacity for Commercial Vehicles | | | |
|---|---|---|---|
| **Class** | **Length** | **Width** | **Seating Capacity (Including Driver)** |
| Small | Under 24 ft. | Under 9 ft. | 6 |
| Mid-Size | 24 ft. and Greater | 9 ft. and Greater | 7-15 |
| Large | 24 ft. and Greater | 9 ft. and Greater | 16-30 |
| Extra-Large | 24 ft. and Greater | 9 ft. and Greater | 31+ |
| Taxicab | Under 24 ft. | Under 9 ft. | 6 |
| TNC | Under 24 ft. | Under 9 ft. | 8 |

# APPENDIX "H"

## APPLICATION INSTRUCTIONS

Steps

1.   Complete application and vehicle information forms located on the airport website.
     https://www.flynashville.com/ground-transportation/Pages/Permits.aspx

     (Note: Only one class per application). The Airport Authority has final decision in determining the class of a Commercial Ground Transportation Operator.

2.   Attach appropriate city, state, or federal license/certificate required to provide specified ground transportation service. Operators exempt from city, state, federal licensing and/or certification must attach appropriate documentation stating such exemption.

3.   Attach certificate of insurance or copy of certificate as evidence of coverage in the amounts specified on APPENDIX "E", MINIMUM INSURANCE REQUIREMENTS.

4.   Return all items as specified in Steps 1 - 3 above to:

Attn: Landside Operations
Metropolitan Nashville Airport Authority
One Terminal Drive, Suite 501
Nashville, Tennessee 37214-4114

DocuSign Envelope ID: 2CAC0E80-B8B1-4DB7-A39B-6C29D67A5576

# APPENDIX "I"

## GROUND TRANSPORTATION MAPS



Case 3:21-cv-00128   Document 1-2   Filed 02/18/21   Page 95 of 102 PageID #: 106

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER |
|---|---|---|
| PLAINTIFF | DEFENDANT | |

TO:  (NAME AND ADDRESS OF DEFENDANT)

Method of Service:

- ☐ Certified Mail
- ☐ Davidson Co. Sheriff
- ☐ *Comm. Of Insurance
- ☐ *Secretary of State
- ☐ *Out of County Sheriff
- ☐ Private Process Server
- ☐ Other

List each defendant on a separate summons.          *Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU.  YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW.  IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number) | FILED, ISSUED & ATTESTED |
|---|---|
| | **MARIA M. SALAS, Clerk and Master**<br>By:                    1 Public Square<br>                         Suite 308<br>                         Nashville, TN 37201<br><br><br>                    **Deputy Clerk & Master** |

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing.  The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | **Sheriff** |

***Submit one original plus one copy for each defendant to be served.**

�findADA Coordinator, Maria M. Salas (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows:  (Name of Party Served) _____

□ Served _____ □ Not Found _____
□ Not Served _____ □ Other _____

| DATE OF RETURN: | By: |
|---|---|
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20___.** Signature of ____ Notary Public or ____ Deputy Clerk | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| My Commission Expires: | |

### NOTICE OF PERSONAL PROPERTY EXEMPTION

| TO THE DEFENDANT(S): | |
|---|---|

TO THE DEFENDANT(S):
    Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment.  If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court.  The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list.  Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them.  If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

    Mail list to:  Clerk & Master
                      1 Public Square
                      Suite 308
                      Nashville TN 37201

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

| I, Maria M. Salas, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case. | MARIA M. SALAS, Clerk & Master By: |
|---|---|
| | D.C. & M. |



MARIA M. SALAS
CLERK & MASTER
CHANCERY COURT

1 PUBLIC SQUARE, SUITE 308
NASHVILLE, TENNESSEE 37201
(615) 862-5710
www.chanceryclerkandmaster.nashville.gov

January 19, 2021

Tennessee Division of Consumer Affairs
Tennessee Attorney General's Office
P. O. Box 20207
Nashville, TN 37202-0207

Re:  **DAVIDSON COUNTY CHANCERY COURT CASE NO.: 21-0045-IV
METROPOLITAN NASHVILLE AIRPORT AUTHORITY vs. TURO, INC.
and JOHN DOE DEFENDANTS 1-100**

Notice per Tennessee Consumer Protection Act

Dear Sir/Madam:

In accordance with T.C.A §47-18-109(f)(1), please find enclosed a copy of the pleading or order in the above-referenced case filed in the Chancery Court of Davidson County, Tennessee.

Please contact me if you need additional information.

Sincerely,

Bettie Ross,
Deputy Clerk and Master

Enclosure

⚘ **ADA Coordinator, Maria M. Salas (862-5710)**

| STATE OF TENNESSEE<br>20TH JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER |
|---|---|---|
| PLAINTIFF | DEFENDANT | |

TO:  (NAME AND ADDRESS OF DEFENDANT)

Method of Service:

☐  Certified Mail
☐  Davidson Co. Sheriff
☐  *Comm. Of Insurance
☐  *Secretary of State
☐  *Out of County Sheriff
☐  Private Process Server
☐  Other

List each defendant on a separate summons.        *Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU.  YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW.  IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number) | FILED, ISSUED & ATTESTED |
|---|---|
| | MARIA M. SALAS, Clerk and Master<br>By:            1 Public Square<br>                 Suite 308<br>                 Nashville, TN 37201<br><br>*/s/ Bettie Ross*<br><br>**Deputy Clerk & Master** |

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing.  The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | **Sheriff** |

***Submit one original plus one copy for each defendant to be served.**

⚕ADA Coordinator, Maria M. Salas (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

□ Served _____     □ Not Found _____

□ Not Served _____     □ Other _____

| DATE OF RETURN: | By: |
| --- | --- |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the _____ day of _____, 20___, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case _____ to

the defendant _____. On the _____ day of _____, 20___, I received the return

receipt, which had been signed by _____ on the _____ day of _____, 20___.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| **Sworn to and subscribed before me on this _____ day of _____ _____, 20___.**<br>Signature of ____ Notary Public or ____ Deputy Clerk<br><br><br>My Commission Expires: | Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process. |
| --- | --- |

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to:  Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

| I, Maria M. Salas, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case. | MARIA M. SALAS, Clerk & Master<br><br>By: /s/ Bettie Ross<br><br>                                        D.C. & M. |
| --- | --- |

E-FILED
2/3/2021 3:31 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

1/19/2021 10:0?
CLERK & MASTE
DAVIDSON CO. CHANCERY C

| STATE OF TENNESSEE<br>20ᵀᴴ JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS** | CASE FILE NUMBER<br><br>20-0045-IV |
|---|---|---|
| **PLAINTIFF**<br>METROPOLITAN NASHVILLE AIRPORT AUTHORITY | | **DEFENDANT**<br>TURO, INC. and John Doe Defendants 1-100 |

TO:     (NAME AND ADDRESS OF DEFENDANT)

Turo, Inc.
c/o Incorporating Services, LTD.
3500 S. Dupont Highway
Dover, DE  19901

Method of Service:

- [x] Certified Mail
- [ ] Davidson Co. Sheriff
- [ ] *Comm. Of Insurance
- [ ] *Secretary of State
- [ ] *Out of County Sheriff
- [ ] Private Process Server
- [ ] Other

List each defendant on a separate summons.

\*Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU.  YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW.  IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| **Attorney for plaintiff or plaintiff if filing Pro Se:**<br>(Name, address & telephone number)<br>W. Scott Sims (#17563)<br>Michael R. ONeill (#34982)<br>Grace A. Fox (#37367)<br>SIMS\|FUNK, PLC<br>3322 West End Avenue, Suite 200<br>Nashville, Tennessee 37203<br>(615) 292-9335<br>(615) 649-8565 (fax) | **FILED, ISSUED & ATTESTED**<br><br>01-19-2021<br><br>**MARIA M. SALAS, Clerk and Master**<br>By:              **1 Public Square**<br>                      **Suite 308**<br>                      **Nashville, TN 37201**<br><br>*/s/ Bettie Ross*<br><br>**Deputy Clerk & Master** |
|---|---|

### NOTICE OF DISPOSITION DATE

The disposition date of this case is twelve months from date of filing.  The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| **TO THE SHERIFF:** | **DATE RECEIVED**<br><br><br>**Sheriff** |
|---|---|

***Submit one original plus one copy for each defendant to be served.

♿ADA Coordinator, Maria M. Salas (862-5710)

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____  ☐ Not Found _____
☐ Not Served _____  ☐ Other _____

| DATE OF RETURN: | By: |
| | Sheriff/or other authorized person to serve process |

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the __19th__ day of __January__, 20 21, I sent, postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case __20-004514__ to the defendant __Turo, Inc__. On the __29th__ day of __January__, 20 21, I received the return receipt, which had been signed by __Piredz (sp)__ on the __25th__ day of __January__, 20 21. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this __2nd__ day of __February__, 20 21.

Signature of __X__ ☐ Notary Public or ☐ Deputy Clerk

My Commission Expires: __5/27/2021__

Signature of plaintiff, plaintiff's attorney or other person authorized by statute to serve process.

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S)

Tennessee law provides a ten thousand dollar ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to: Clerk & Master
1 Public Square
Suite 308
Nashville TN 37201

Please state file number on list.

### CERTIFICATION (IF

I, Maria M. Salas, Clerk & Master of the Chancery Court in the State of Tennessee, Davidson County, do certify this to be a true and correct copy of the original summons issued in this case.

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:
   Turo, Inc.
   c/o Incorporating Services, LTD
   3500 S. Dupont Hwy
   Dover, DE 19901

9590 9403 0342 5163 5200 68

2. Article Number (Transfer from service label)
   7018 1130 0002 0526 6572

PS Form 3811, April 2015 PSN 7530-02-000-9053   Domestic Return Receipt

COMPLETE THIS SECTION ON DELIVERY

A. Signature
   X _____ ☐ Agent ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery
   Piredz   1/25/21
D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Restricted Delivery
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery